David K. PRATT and Teri D. Pratt, Plaintiffs–Appellees,

v.

BROWN MACHINE COMPANY, A DIVISION OF JOHN BROWN, INC., Defendant–Appellant.

No. 87–1154.

United States Court of Appeals, Sixth Circuit.

Argued March 25, 1988.

Decided Sept. 7, 1988.

Noel A. Gage, William F. Ager, III, Bushnell, Gage, Doctoroff, and Reizen, Southfield, Mich., George E. Bushnell (argued), for defendant-appellant.

Sheldon J. Stark (argued), Stark & Gordon, Detroit, Mich., for plaintiffs-appellees.

Before MILBURN and BOGGS, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

BOGGS, Circuit Judge.

Brown Machine Company appeals a jury verdict in favor of David and Teri Pratt on their claims for wrongful discharge, violation of Michigan public policy, intentional infliction of emotional distress, and loss of consortium. We conclude that David Pratt was an at-will employee, as a matter of law, and reverse the judgment on his wrongful discharge claim. We affirm the judgment for the Pratts on the remaining claims.

## I. FACTS

Since Brown Machine appeals from a jury verdict in favor of the Pratts, we view the evidence in the light most favorable to the plaintiffs. *Ivey v. Wilson*, 832 F.2d 950, 953 (6th Cir.1987). Brown Machine Company manufactures large thermoforming systems and sells the machinery worldwide. The company employs a technical service staff, which provides repair work wherever the machinery is located.

In August 1976, Brown Machine hired David Pratt as a technical service trainee. Pratt had heard about the company from Tim Weldon, a former high school classmate. Weldon told Pratt that the company was looking for someone who "would like to work in the service department and travel, and someone that needed a full time job."

At the time Pratt began working for Brown Machine, he had several conversations about "longevity" with Rod Schulte, manager of the Parts and Service Department, and Richard Levely, who was then the Personnel Manager. Schulte told Pratt that Brown Machine had a history of training new hires, who would leave the company because of the extensive travel required by the job. As Pratt recalled the conversation, "So his [Schulte's] primary interest was [that] I would be with them 15, longer, years or whatever, stay with them so that they could benefit more from training me." Pratt was ready for such an undertaking. He indicated that he was looking for long-term employment.

Pratt's initial employment involved a 90-day probationary period. He received a one-page, hand-written document outlining his duties. He would be accompanying service personnel for six months to become familiar with his responsibilities. He was instructed to give "110%" total commitment; to "ask questions, dig, probe, seek" and to "respond to customer needs." The document also indicated that Pratt would be attending hydraulics school in September.

Pratt testified that Schulte and Levely told him that upon completion of the probationary period, he would become a "permanent" employee. Indeed, when the period did expire, Pratt received a pay raise and additional benefits, and his status changed from trainee to technical service representative.

In September, Brown Machine received writs of garnishment on Pratt's wages. Concerned that the writs might cause problems with the company, Pratt spoke to Schulte. According to Pratt, Schulte indicated that Brown Machine would not fire him "without just cause." If such a decision had to be made, the company would consider his work performance and his cooperation with fellow employees.

In November 1977, Brown Machine's new Director of Personnel, Ralph Garbe, was instructed to develop an employee handbook for distribution to the company's staff. By collecting all the written policies that were then in force in the different departments and discarding those that were outdated, he was able to produce a sizable handbook for general reference. Garbe completed the project in 1980 and distributed the handbook to every employee at Brown Machine.

According to Brown Machine, each handbook had a final "tear-out page," which read as follows:

I hereby acknowledge receipt of a copy of the "Brown Hourly Employee Handbook," and affirm that I realize the significance of the rules, policies and information in this handbook. I also understand these policies are subject to change by management, unilaterally and without notice.

*It is agreed, that my employment with the Company, is at the will of the Company.* (emphasis added)

Although all employees were requested to sign and return the final page, it was not a company requirement. Garbe estimated that some 85 percent of the employees signed the back page and returned it to management. Nevertheless, Brown Machine considered the final page, including the at-will language, to be the policy of Brown Machine. According to Garbe, "Whether they [the employees] signed the back page or not didn't make any difference, it was still a manual that the company was following for employee policies and benefits."

Pratt introduced a copy of the handbook without the final tear-out page, which he received from a fellow worker; he was unable to produce his own. Pratt testified that he did receive the employee handbook, but did not recall whether he received or signed the final tear-out page. The following colloquy during Pratt's cross-examination is illustrative:

BROWN MACHINE'S COUNSEL: Where is the original book that you got rather than the one you borrowed from some friend?

PRATT: I believe I left it in my personal file at Brown Machine.

BROWN MACHINE'S COUNSEL: So the original book you got might have all the pages, as far as you know?

PRATT: It may have.

.    .    .    .    .

THE COURT: Do you have access to your personnel file now at Brown Machine?

PRATT: No.

.    .    .    .    .

THE COURT: Do you know whether or not it had that additional page in it?

PRATT: I don't remember, your Honor.

Brown Machine introduced a copy of the handbook with the final tear-out page. Garbe testified that every handbook that was distributed had the final page, and that all employees received a copy of the manual. However, the personnel director could not say from personal knowledge whether the final page went to Pratt. Although the final page indicated that it was to be placed in the personnel file upon return, Brown Machine was unable to locate and thus introduce a final page with Pratt's signature.

The handbook contains a section entitled, "Company Rules," which lists "acts" that could "result in disciplinary action ranging from verbal or written warnings to suspension or to immediate discharge depending upon the act and the circumstances." The philosophy of the section is one of "progressive corrective discipline," although the handbook makes clear that certain actions will result in immediate discharge. This included fighting or committing an assault, using abusive or threatening language, and disorderly, offensive or immoral conduct.

Pratt examined these sections when he first received the handbook. He recalled thinking that he "had a lot of job security, because [he did not] break rules like that."

By all accounts, Pratt was a highly valued employee at Brown Machine. Four years into Pratt's employment, Schulte told Pratt that "the probability of continued employment was very good." Pratt continued to receive pay raises, as well as compliments on his job performance.

In the Spring of 1982, Teri Pratt began receiving obscene and harassing telephone calls, which continued for some eighteen months. Teri Pratt estimated that she received between 80 to 100 calls. Some of them demanded sex; others threatened rape. The caller knew Teri's name, the description of her car, and where she lived.

Many of the calls came when David Pratt was out of town on a service call.[1] The calls frightened the Pratts, who lived on an isolated country road far from neighbors.

At first, the Pratts did not go to the police, hoping the calls would stop. That did not occur. In November 1982, Pratt contacted the state police, which began an investigation. Teri Pratt also sought the assistance of the telephone company, but she was told there was a long waiting list for a phone trap. Frustrated with the delay, the Pratts decided not to pursue the trap.

State Trooper Jack Peet was initially in charge of the Pratt investigation. He told Teri Pratt to maintain a log of the calls, and provided recording equipment for possible voice print analysis. The Pratts made several recordings of the caller's voice, but most were of insufficient quality. Eventually, the Pratts returned the equipment, and used their own with better results.

By February 1983, the police efforts had been unsuccessful. A month earlier, Teri Pratt had arranged a meeting with the caller at a local motel in an effort to catch him, but he never showed up. On February 27, Officer Peet had his last contact with the Pratts and closed the investigation.[2] According to Teri Pratt, Peet indicated that they "had exhausted all their possibilities, . . . and the case should be closed because he didn't know what more he could do." He advised them to seek a phone trap, despite their concerns and the long waiting list. Peet believed that a phone trap was the only means of determining the origin of the telephone calls: "When I had the last contact with Mr. Pratt and he indicated that he did not want to deal with [the telephone company], therefore a line trap would not be put on, therefore, compounding the problem, I

would not be able to get prosecution in the matter; based on that, I closed the investigation." The Pratts were reluctant to pursue the phone trap. They feared retaliation if the caller were questioned and happened to be released.[3]

During this time, the Pratts did not change their telephone number, despite Officer Peet's suggestion to the contrary. According to David Pratt, "[t]he caller had always insisted he was going to come out to our house, and we felt that by changing the telephone number, he might just do that." The Pratts' refusal to heed the advice was not unusual. Officer Peet testified that "almost everyone" resisted changing their telephone numbers in these cases. He indicated that there was nothing unusual about the Pratts' reasons for doing so. State Trooper Thomas Huber, who later reopened the investigation, also said he understood their rationale.

Thereafter, Pratt decided to pursue the investigation on his own. In March 1983, he took a week off with pay to find out who the obscene caller was. He questioned several people, but came up with no leads.

On August 6, 1983, the Pratts were at a company picnic when an upper level manager, Ted Griffore, said grace over the public address system. After Griffore finished his prayer, Teri Pratt came rushing over to her husband. Looking scared and upset, she exclaimed: "that's the voice, that's the voice, that's the guy that's been calling us." At first, David Pratt did not believe Teri was correct.

On August 16, Teri Pratt received and recorded three additional obscene calls. David Pratt returned from a trip, listened to the tapes, and concluded that Griffore

---

1. According to State Trooper Jack Peet, the caller stated on several occasions that he was aware David Pratt was out of town. Because of this pattern, the State Police believed the calls were originating from Brown Machine. In fact, many employees at Brown Machine were receiving obscene telephone calls during this period. According to one victim, Rebecca French, the caller said on many occasions that he would see her at work.

2. According to Peet, "[c]losing the investigation just means that no further active investigation will be done by the officer, and a monthly review will not be done by a sergeant."

3. Eventually, the Pratts did secure a phone trap for two weeks, but no calls were received during this period.

was the caller. He decided to seek confirmation at Brown Machine.

On August 18, Pratt took one of his wife's tapes to Brown Machine and played it to several employees during company time. That day and the next, ten or more Brown Machine employees heard the tape and several thought it sounded like Griffore's voice. Tim Weldon, Griffore's officemate and Pratt's supervisor, heard the tape initially and thought it "definitely" sounded like Griffore. Becky French believed it sounded like Griffore; so did Patty Noseda.[4]

On August 19, Pratt threatened Griffore in the latter's office. After playing the recording for the manager, Pratt demanded that Griffore admit that he had been the obscene caller. Pratt said: "If you lie to me, I'm going to beat you up behind your desk." According to Pratt, Griffore replied that "he didn't know if it was his voice, because he never heard his voice on a recorder before." Pratt told Griffore that he would return in an hour and wanted an explanation.

Pratt returned a short time later, but Griffore had left the plant by that time, accompanied by the personnel director, Garbe. According to Garbe, Griffore was emotionally upset, and denied having any knowledge of the calls. Garbe felt it was best to take Griffore off the premises to calm him down and to prevent a further encounter with Pratt.

At the behest of Garbe, Tim Weldon, who was a service manager at Brown Machine, met Pratt at the latter's home later that afternoon. Weldon told Pratt that he should take some time off until things settled down. He would also try to get Pratt some pay. According to Pratt, when he asked why Griffore was calling his family, Weldon stated, "Dave, you're not saved, you don't go to church." Pratt replied, "Tim, I've been saved. Church, I'll agree, it's going to help me cope with things better, but the guy won't quit calling and the

church probably won't make him quit calling."

That day, the Pratts made arrangements to change their telephone number. David Pratt explained: "We knew who it was, and we [were] no longer worried about him coming out to our place." After the change, the obscene calls to the Pratt home stopped.

On August 30, Ralph Garbe went to see Pratt. They talked about the calls and the other employees who had recognized Griffore's voice. They also discussed the harassing telephone calls that other employees were receiving. When Garbe heard the tape, he agreed that the tape sounded similar to Griffore's voice, but he insisted that Brown Machine believed Griffore was innocent. He also indicated that he did not want the state police involved, but thought a voice analysis would be appropriate. Considering this a "personal problem," Garbe decided that Pratt should continue with his "leave of absence."

In order to get a new recording of Griffore's voice, Pratt made several non-threatening calls to the manager at Brown Machine and at home. Griffore, who wanted to be cleared as a suspect, went to the police. As a result, State Trooper Thomas Huber reopened the investigation. Huber believed the best avenue to pursue was a voice print identification. As events proceeded, Griffore refused to submit to the analysis, despite his initial assertions to Huber and Garbe that he would.

Brown Machine made available to the police pertinent information, including Pratt's travel schedule, in order to determine the identity of the obscene caller. Huber believed the calls were coming from Brown Machine and, after listening to the Pratts' recordings, focused his attention on Griffore. Yet, without Griffore's cooperation, the police were unable to proceed much further.

By September 29, Pratt had still not been allowed to return to work and he wanted

---

4. Officer Huber, who later compared a recording of Griffore's voice to that of the caller's, advised Pratt that there were similarities that led him to increase his suspicion that Ted Griffore was the caller. However, he cautioned that he was not a voice print expert and "it's strictly one man's opinion as to the conversation."

the situation resolved. Garbe arranged a meeting at Huber's office; Garbe, Pratt, Weldon and Trooper Huber were present. Garbe told Pratt that Brown Machine had just cause for termination, but he wanted to resolve the situation and have Pratt return to work. However, the personnel director had conditions for Pratt's return. Pratt had to apologize to Griffore, or at least admit he made a mistake, and declare in writing that he would not hold Brown Machine responsible for the obscene calls. In addition, Pratt had to drop the investigation.[5] Pratt refused and the meeting ended.[6] Pratt wanted to come back to work, but not under those conditions. He said he would pursue the voice print if possible, and suggested Griffore should seek psychiatric help.

The following day, Garbe sent Pratt a letter notifying him of his discharge. It read:

Dear Mr. Pratt:

As we are unable to reach you by phone, the purpose of this letter is to state Brown Machine's position regarding your recent personal problem.

It has been over six weeks since your suspension,[7] and it appears that you have been unable to resolve the problem. Therefore, we are changing your status from suspension to termination as of September 30, 1983.

Should you decide to take any action which might impair the reputation of Brown Machine, or its business relationships, we shall promptly pursue appropriate legal remedies.

Pratt continued to work with the police, but with little success. By December 1983, the Pratts were having serious financial difficulties, and, in a letter to Brown Machine's president, Jim Sharpe, he desperately sought his job back. Pratt met with Garbe on January 2, 1984. Garbe indicated that all the employees were talking about the situation, and that Griffore would resign if Pratt returned. Garbe reiterated many of the conditions that were discussed at Trooper Huber's office. Pratt agreed to apologize to Griffore, Jim Sharpe, and Brown Machine, but would not put it in writing. Although he still believed Griffore was the caller, Pratt thought that it was best "to try and end things," especially since his family was no longer receiving obscene calls.

A second meeting, with President Sharpe, was scheduled for January 10, 1984. In that meeting, Sharpe acknowledged that management had handled the situation improperly, but he did not want Brown Machine to be considered at fault. Sharpe had conditions for Pratt's return to Brown Machine. He would have to apologize to Griffore and agree not to discuss the telephone calls on or off the job; he would have to work directly for Griffore. Moreover, Pratt would have to attend church and pray with Griffore.

Sharpe forced Pratt to rehearse over and over again, "I don't want to talk about it, I can't talk about it," which Pratt was required to respond if he were asked whether Griffore was the obscene· caller. If Pratt refused, he would be terminated.

PRATT'S COUNSEL: Give me an example of something he [Sharpe] asked you to respond to?

PRATT: He said: well, okay, suppose you're at the Beaverton bowling alley, sitting over a beer. Then he says: oh, that's right you don't drink.

But he says: suppose you are, and suppose one of the boys says: what are they doing, keeping you quiet? He says, how are you going to respond?

---

**5.** This would have ended the police's involvement in the episode. Officer Huber testified that had Pratt indicated that he wanted his tapes back and did not want to pursue the investigation any further, he would have closed the investigation as of September 29.

**6.** In Garbe's words, "Dave [Pratt] would not agree to drop the issue and return to work. He ws [sic] told he would be terminated."

**7.** Pratt was surprised that his "leave of absence" was now being considered a suspension. Garbe testified that the latter term was used to ensure that Pratt would receive unemployment compensation.

I says: I can't talk about it, I don't want to talk about it.

He says: no, he says, that's wrong. You said can't first, he says, you got to say: I don't want to because it would be misleading to the company, and we don't want people to think that the company has done anything wrong.

So he says: okay, what if you're out in tooling and one of the guys says: come on, Dave, tell us, was it Ted or not? What's your response?

I said: well, I probably wouldn't say anything, I would just walk away.

He says: no, that's an improper response. He says: you got to say this phrase, and I want you to learn it and we're going to keep rehearsing you on it. And if you slip one time, we want you to know that you're going to be immediately terminated.

That phrase is: I don't want to talk about it, I can't talk about it.

PRATT'S COUNSEL: Did he use that tone of voice?

PRATT: He was loud, yes.

At the end of the meetings, Sharpe made a startling revelation: Griffore had confessed to making the obscene telephone calls. He also conceded that Pratt had proved Griffore's guilt. Sharpe told a shocked Pratt that the meeting was over; that more rehearsals would be needed before they would decide to hire him back.

Pratt described his feelings: "I was feeling like I crawled [sic], I crawled, I crawled, and I couldn't crawl any more. I mean it wasn't right." He demanded an out-of-court settlement for the damages his family suffered, as well as his job back. He submitted to Brown Machine photographs of his wife and three children, noting that they were four innocent people who went through a nightmare. He requested that a $75,000 check be attached to each picture, for a total sum of $300,000.

The letter accompanying the pictures indicated that Pratt would "stop gathering information," "stop talking" and "end all matters," if he received the requested sum in settlement. Otherwise, he threatened to sue Brown Machine, and file criminal charges "against Brown Machine Company and seven individuals." Shortly thereafter, Brown Machine informed Pratt that he would not be rehired. The company did not agree to any settlement.[8]

On September 13, 1984, Pratt and his wife filed the instant lawsuit against Brown Machine, alleging wrongful discharge, "public policy tort," intentional infliction of emotional distress and loss of consortium. The district court dismissed Teri Pratt's emotional distress claim, and the case went to trial. The jury returned a verdict in favor of the Pratts on all claims in the amount of $152,000.[9] The district court denied Brown Machine's motions for judgment NOV and for a new trial. This appeal followed.

## II. WRONGFUL DISCHARGE

In his complaint, Pratt asserted that he was discharged without just cause on September 30, 1983. His claim is based on *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980). In *Toussaint*, the Michigan Supreme Court held that a provision of an employment contract providing that an employee shall not be discharged except for cause is legally enforceable although the contract is not for a definite term. *Id.* at 598, 292 N.W.2d at 885. Such a provision may become part of the contract either by express agreement, oral or written, or as a result of an employee's legitimate expectations grounded in an employer's policy statements. *Ibid.* These legitimate expectations may be grounded "in an employer's written policy statements as set forth in

8. Griffore left Brown Machine on March 30, 1984. On October 3, 1984, Jim Sharpe was transferred to "another John Brown, Inc., Operating Unit."

9. The jury awarded damages as follows: $62,000 in economic damages for David Pratt's wrongful termination of employment; $60,000 in noneconomic damages for his termination in violation of Michigan public policy; $20,000 for intentional infliction of emotional distress; and $10,000 for Teri Pratt's loss of consortium claim in connection with her husband's emotional distress claim.

the manual of personnel policies." *Renny v. Port Huron Hospital,* 427 Mich. 415, 398 N.W.2d 327 (1986).

The Michigan Supreme Court emphasized, however, that employers were "most assuredly free to enter into employment contracts terminable at will without assigning cause." *Toussaint,* 408 Mich. at 610, 292 N.W.2d at 890. Elaborating, it said, "Where the employer has not agreed to job security, it can protect itself by entering into a written contract which explicitly provides that the employee serves at the pleasure or at the will of the employer or as long as his services are satisfactory to the employer." *Id.* at 612 n. 24, 292 N.W.2d at 891 n. 24. *See also Renny,* 427 Mich. at 428, 398 N.W.2d at 334.

Brown Machine contends that Pratt was, as a matter of law, an at-will employee who could be fired without cause. The company relies on the employee handbook, particularly the tear-out page, which it says put Pratt on notice that he "serve[d] at the pleasure or at the will of the employer." *Toussaint,* 408 Mich. at 612 n. 24, 292 N.W.2d at 891 n. 24. We agree.

█ It is important to emphasize at the outset that there is no explicit agreement in this record to terminate for just cause.[10] The central issue in this case, therefore, is the impact of the tear-out page in Brown Machine's employee handbook, which expressly indicated that employment was at the will of the company. A careful reading of the record, even viewed in a light most favorable to the plaintiff, reveals that this was Brown Machine's stated policy at the time Pratt was discharged. Ralph Garbe, Director of Personnel, testified that the final tear-out page reflected the company's policy. He also stated that every handbook that was distributed had the final page, and that all employees received a copy of the manual. Pratt never disputed any of these assertions.

Pratt admitted he received the handbook, but did not recall whether he received or signed the final tear-out page. When he was asked whether his copy of the manual might have had this last page, he responded that "[i]t may have." We believe this response and similar statements are insufficient to raise an issue of fact whether Brown Machine had reserved the right to fire employees without just cause. Pratt may not create a dispute of fact concerning an issue about which he has no recollection.

That Pratt may not have signed the final tear-out page is not dispositive. According to Garbe's undisputed testimony, Brown Machine considered the policy reflected in the tear-out page to be controlling, even though it was not a company requirement that employees sign and return the final page. In short, Brown Machine "took the action expressly approved in *Toussaint* and entered into contracts with its employees making the employment of each individual terminable at will." *Ledl v. Quik Pik Food Stores, Inc.,* 133 Mich.App. 583, 588, 349 N.W.2d 529, 531 (1984).

Pratt argues that he had legitimate expectations that the company would not discharge him without just cause. First, he focuses on the "Company Rules" section of the handbook, which lists "acts" that could "result in disciplinary action ranging from verbal or written warnings to suspension or to immediate discharge depending upon the act and the circumstances." Pratt argues that these rules created an implied contract to discharge only for cause.

We rejected a similar contention in *Reid v. Sears, Roebuck & Co.,* 790 F.2d 453 (6th Cir.1986). There, plaintiffs signed an application for employment providing that "employment and compensation can be terminated with or without cause, and with or without notice, at any time, at the option of either the Company or myself." *Id.* at 456. Once employed, plaintiffs received a Sears employee handbook, "Getting Acquainted with Sears," which listed specific conduct for which the employer could terminate its employees. The plaintiffs argued that "by listing conduct that 'may result in the termination of your employment' in the hand-

---

**10.** This factor distinguishes the instant case from *Toussaint,* where the employee received a manual of personnel policies which explicitly stated that the company would release employees "for just cause only" following a period of probation. 408 Mich. at 617, 292 N.W.2d at 884.

book Sears limited its right to discharge employees and that a discharge for any other reason would not be for good cause." *Id.* at 460. Rejecting this argument, we said:

> We do not believe the listing of causes that 'may result in the termination of your employment' in the Sears handbook detracted in any way from the language in the application or provided a reasonable basis for the conclusion that the plaintiffs were employed under a "for cause" contract. The fact that certain acts were identified as conduct that might lead to discharge did not indicate that these acts were the exclusive permissible grounds for discharge. Moreover, the Sears handbook had no language similar to that relied upon in *Toussaint:* "to treat employees leaving Blue Cross in a fair and consistent manner *and to release employees for just cause only.*" 408 Mich. at 617, 292 N.W.2d 880 (emphasis added).

*Ibid.*

Similarly, the Company Rules section in the instant case does not detract in any way from the at-will language in the tear-out page, which reflected Brown Machine's policy at the time of Pratt's discharge. On the strength of *Reid,* we conclude that this section did not raise a jury issue as to an implied just cause contract. *Ibid.* But see *Dalton v. Herbruck Egg Sales Corp.,* 164 Mich.App. 543, 417 N.W.2d 496 (1987).[11]

■ Next, Pratt relies upon certain assurances he received when he began working for Brown Machine. For example, Rod Schulte told Pratt that he wanted the new hire to be with the company some fifteen years or longer. Pratt responded that he was looking for long-term employment.

Schulte also said that at the completion of his probationary period, Pratt would become a "permanent" employee. Indeed, four years into his employment, the probability of continued employment was "very good," as stated on an employment verification form concerning a mortgage loan. From these, Pratt argues that he had a legitimate expectation of a just cause contract. We disagree.

None of these statements indicate that Pratt would be terminated for cause only. They merely express the "optimistic hope" of parties to an employment relationship that their future association will be profitable and long-standing. *See Carpenter v. American Excelsior Co.,* 650 F.Supp. 933, 936 n. 6 (E.D.Mich.1987) ("neither party to the beginning of an employment relationship expects it to be unsatisfactory, and both hope it will have a significant duration."). That Pratt's chances for continued employment were "very good," as stated on the employment verification form, merely reflected what plaintiff could expect if he performed his job well; it said nothing about Brown Machine's termination policy. *See Dzierwa v. Michigan Oil Co.,* 152 Mich.App. 281, 393 N.W.2d 610, 613 (1986). We also do not put much stock in the characterization of Pratt's employment as "permanent," as that term generally implies only a non-probationary relationship.

Pratt relies on *Walker v. Consumers Power Co.,* 824 F.2d 499 (6th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 711, 98 L.Ed.2d 661 (1988). There, we observed that the Michigan Court of Appeals had allowed *Toussaint* claims to go to the jury where

> the employee testified that he was promised that he "would never have to worry"

---

11. The dissent takes us to task for refusing to follow the decision of the Michigan Court of Appeals in *Dalton v. Herbruck Egg Sales Corp.,* 164 Mich.App. 543, 417 N.W.2d 496 (1987). While it is true that "[t]he law of Michigan is controlled by a decision of the Michigan Court of Appeals until the Michigan Supreme Court or another panel of the Michigan Court of Appeals rules otherwise," *Wieczorek v. Volkswagenwerk, A.G.,* 731 F.2d 309, 310 (6th Cir.1984) (citations omitted), it is equally true that we need not blindly follow such precedent where we are '"convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1140 (6th Cir.1986) (quoting *Clutter v. Johns–Manville Sales Corp.,* 646 F.2d 1151, 1153 (6th Cir.1981)). We believe *Dalton* is inconsistent with the teachings of *Toussaint* and its progeny, and thus subscribe to the better reasoned analysis of Judge Lively in *Reid v. Sears, Roebuck & Co.,* 790 F.2d 453 (6th Cir. 1986).

as long as he did his job. *Cowdrey v. A.T. Transport,* 141 Mich.App. 617, 367 N.W.2d 433, 434 (1985), that he "would have a lifetime job as long as he did not steal," *Bullock v. Automobile Club of Michigan,* 146 Mich.App. 711, 715, 381 N.W.2d 793, 794 (1985), *appeal pending,* and that she would "[have] a job as long as [she] did a good job," *Hetes v. Schefman & Miller Law Office,* 152 Mich.App. 117, 119, 393 N.W.2d 577, 578 (1986).

*Consumers Power,* 824 F.2d at 504. *Accord, Ritchie v. Michigan Consolidated Gas Co.,* 163 Mich.App. 358, 413 N.W.2d 796 (1987). In *Consumers Power* itself, this court allowed a case to go to the jury where the employee testified that his employer promised he would not be fired as long as he "performed adequately" and "did a good performance on [his] job." *Id.* at 503.

However, we were quick to point out that the Michigan courts denied *Toussaint* claims, as a matter of law, "if the employer expressly indicates that there is no guarantee of future employment or that the employment is terminable at will." *Id.* at 504 (citing *Ford v. Blue Cross & Blue Shield of Michigan,* 150 Mich.App. 462, 465, 389 N.W.2d 114, 115 (1986); *Riethmiller v. Blue Cross & Blue Shield of Michigan,* 151 Mich.App. 188, 198, 390 N.W.2d 227, 232 (1986); *Ledl v. Quik Pik Food Stores, Inc.,* 133 Mich.App. 583, 587, 349 N.W.2d 529, 531 (1984)). In *Consumers Power,* the employer offered no evidence through an employee handbook or otherwise that it had informed employees generally or Walker specifically that employment was at will. *Ibid.* Nor did the employer try in any way to negate the expectation of continued employment. *Id.* at 503.

In the instant case, unlike *Consumers Power,* the employer has expressly indicated that employment is terminable at will. This explicit language in the handbook "means what it says and is binding upon the parties." *Dell v. Montgomery Ward and Co.,* 811 F.2d 970, 974 (6th Cir. 1987). It also serves to negate the legitimacy of any expectation Pratt may have had based on Schulte's representations.[12]

This case is analogous to *Ledl v. Quik Pik Food Stores, Inc.,* 133 Mich.App. 583, 349 N.W.2d 529 (1984). In *Ledl,* the plaintiff was given assurances at the time she accepted employment that she would continue to be employed as long as her performance was satisfactory. Approximately seven and one-half years later, plaintiff signed an employment agreement, which stated in part that her employment could "be terminated with or without cause, and with or without notice at any time at the option of either the Company or myself." The Michigan Court of Appeals concluded the plaintiff failed to state a claim for wrongful discharge because the express at-will language of the contract negated any expectations she may have had based on her employer's assurances.

Pratt also relies on Schulte's statement, in response to Pratt's concern about garnishment of wages, that Brown Machine would not fire him without just cause. Whatever legitimate expectations Pratt may have harbored as a result of this statement, they became unreasonable in 1980 when Brown Machine issued the handbook clearly expressing the company's policy that employment was terminable at will. *See Ledl,* 133 Mich.App. at 588, 349 N.W.2d at 531. There can be little doubt that the employer may unilaterally amend his employment policy. *See Ibid. Cf. Renny v.*

12. We find *Wiskotoni v. Michigan National Bank–West,* 716 F.2d 378 (6th Cir.1983), to be distinguishable in several respects. First and foremost, the employee manual in that case did not contain explicit "at-will" language. Indeed, the manual's language implied that after a probationary period had been served, employees would not be discharged without cause. Moreover, the employer's president never disputed the statements made by Wiskotoni's attorney during cross-examination that "it's your practice

to dismiss for cause." Quite appropriately, on the basis of these factors, the court concluded that there was a question of fact for the jury whether it was company policy not to discharge except for cause.

Similarly, in *Renny v. Port Huron Hospital,* there was "no express statement within the handbook that employees were still terminable at the will of the hospital." 427 Mich. at 431, 398 N.W.2d at 336.

*Port Huron Hospital,* 427 Mich. 415, 428–29 n. 7, 398 N.W.2d 327, 334 n. 7 (1986).

In the unequivocal language of the handbook, Brown Machine reserved the right to fire its employees without cause. *Toussaint* recognizes and approves such action, by reaffirming that employers are "most assuredly free to enter into employment contracts terminable at will without assigning cause." *Toussaint,* 408 Mich. at 610, 389 N.W.2d at 890. We conclude that Pratt's employment with Brown Machine was, as a matter of law, an at-will relationship. Since the district court erred in submitting this issue to the jury, we REVERSE the judgment in favor of David Pratt on this claim.

## III. VIOLATION OF MICHIGAN PUBLIC POLICY

In *Suchodolski v. Michigan Consolidated Gas Co.,* 412 Mich. 692, 316 N.W.2d 710 (1982), the Michigan Supreme Court recognized a "public policy" exception to the general rule that at-will employees may be terminated at any time and for any reason. This exception is based on the principle that "some grounds for discharging an employee are so contrary to public policy as to be actionable." *Id.* at 695, 316 N.W.2d at 711.

The Michigan Supreme Court indicated that "public policy" restrictions on discharge are based on one of three grounds. We summarized these grounds in *Wiskotoni v. Michigan National Bank–West,* 716 F.2d 378 (6th Cir.1983), as follows:

(1) explicit legislative statements prohibiting the discharge of employees who exercise a statutory right or perform a statutory duty, *e.g.,* The Whistleblowers' Protection Act, Mich.Comp.Laws § 15.362; (2) legislative statements of public policy that imply a cause of action for wrongful termination, *e.g.,* refusal to violate a law in the course of employment; and (3) an implied public policy prohibition of a discharge in retaliation for an employee's exercise of a legislatively conferred right, *e.g.,* filing of workers' compensation claims.

*Id.* at 382 (citing *Suchodolski,* 412 Mich. at 695–96, 316 N.W.2d at 711–12). *Suchodolski* makes clear that Michigan law requires "the location of some legislative enactment to ground a finding that a discharge is in breach of public policy." *Wiskotoni,* 716 F.2d at 382–83 (citation omitted).

Pratt asserted that Brown Machine violated Michigan public policy when the company discharged him after he refused to stop pursuing his investigation into the identity of the person who tormented his family with obscene and harassing telephone calls. Consistent with *Suchodolski,* the district court looked to two legislative provisions to imply a cause of action for Pratt's discharge: the compounding statute, Mich.Comp.Laws § 750.149, and, to a lesser extent, the aiding and abetting statute, Mich.Comp.Laws § 767.39.

Reading these two statutes together, the court found that Michigan public policy prohibited:

[a]n employer ... [from] impos[ing] as a condition of employment an agreement, express[ ] or implied, by an employee with knowledge of the commission of a crime to compound or conceal or not prosecute or not to give evidence concerning the commission of the crime.

The public policy is the same, whether the underlying criminal offense is the maker [sic] of obscene phone calls or bank robbery or arson or any other crime. It matters not whether one of its employees or some other person is suspected of having committed the crime.

In support of his claim, Pratt was required to prove that Brown Machine "expressly or impliedly required [him] to agree to compound, conceal, refuse to prosecute or refuse to give evidence in connection with an underlying criminal activity of which he had knowledge." The court continued, "If [Brown Machine] did communicate to [Pratt] that he would have to conduct himself in the manner which violated the compounding statute to continue to have a job, then [Pratt] must also prove he refused to do so, and his refusal was a determinative factor in the decision to terminate the employment relationship." The

court limited Pratt's public policy claim to Brown Machine's conduct when Pratt's employment ended in September 1983; the company's refusal to rehire the plaintiff the following January was not implicated.

Brown Machine challenges the jury's verdict on this claim in several respects. First, the company argues that Pratt failed to establish any violation of a legislatively expressed public policy. Focusing on the compounding statute, the company says that the provision applies only when the underlying offense is a felony; however, since the alleged offense here (obscene telephone calls) was a misdemeanor, Mich. Comp.Laws § 750.540e, the compounding statute is inapplicable.[13] Brown Machine finds that the aiding and abetting statute is equally inapposite because "the subject conduct occurred long after the phone calls had been made."

By focusing too finely on the statutory requirements, Brown Machine suggests why a criminal action might fail, but misses a fundamental point. The district court cited these statutes merely as the legislative foundation upon which a cause of action of this nature could be implied. The court rightly found that the compounding statute, read in conjunction with the aiding and abetting statute, provided "sufficient legislative expression" of a policy that prohibits an employer from conditioning employment upon the employee's agreement to conceal or stifle an investigation into a crime. *See Case v. Smith,* 107 Mich. 416, 65 N.W. 279, 280 (1895). *See also Fidelity & Deposit Co. of Maryland v. Grand Nat. Bank of St. Louis,* 69 F.2d 177, 180 (8th Cir.1934) (and cases cited therein). The district court did not suggest, quite appropriately, that Pratt could only succeed on his public policy claim if he proved a violation of the underlying legislative enactments. There is no support for this contention in the case law.

For example, in *Trombetta v. Detroit, Toledo & Ironton Railroad Co.,* 81 Mich. App. 489, 265 N.W.2d 385 (1978), the Michigan Court of Appeals ruled that it would have violated public policy to terminate an employee for refusing to alter pollution control reports which were required to be filed with the State. The court said it "was without question that the public policy of this state does not condone *attempts* to violate its duly enacted laws." *Id.* at 495, 265 N.W.2d at 388 (emphasis added). Significantly, although falsification of such reports would clearly violate Michigan law, Mich.Comp.Laws § 323.10(1, 2), MSA § 3.529(1)(1, 2), the plaintiff was not required to show that he or the employer did in fact violate this statutory mandate. It was sufficient that the employer requested the employee to do so, and discharged the latter when he refused to comply with the employer's request.

■ Similarly, Pratt need not show that either he or Brown Machine violated the compounding statute or the aiding and abetting statute. It is sufficient that the company requested the plaintiff to drop his investigation into criminal wrongdoing, and terminated him for his refusal to do so.

■ Next, Brown Machine contends that, even if Pratt's public policy theory is viable, he should have proceeded first under the Whistleblowers' Protection Act. Mich.Comp.Laws § 15.362. The Michigan Court of Appeals, recognizing that terminations in violation of public policy are an exception to at-will employment contracts, has held that "administrative remedies provided by the Legislature in statutory schemes embodying those public policies must be pursued before a grievant may seek legal redress in the courts." *Cockels v. International Business Expositions, Inc.,* 159 Mich.App. 30, 406 N.W.2d 465 (1987) (and cases cited therein). Indeed, in *Covell v. Spengler,* 141 Mich.App. 76, 366 N.W.2d 76 (1985), the court held that a

---

**13.** Brown Machine says the compounding statute is inapplicable for two additional reasons. First, the provision applies only to pending criminal litigation, such as a trial, grand jury proceedings or at least a pending criminal complaint. Second, the statute requires actual knowledge of the principal who committed the underlying crime. Brown Machine argues that there is no evidence or inferences therefrom that Pratt had actual knowledge that Griffore was the obscene caller.

worker who was fired for exercising his right to bring an overtime pay claim to the labor board could not maintain an action for wrongful termination under a public policy tort theory, because he failed to seek redress first under the Whistleblowers' Protection Act. However, Brown Machine never raised this issue before the district court at any time, and we deem it waived. A timely motion raising this issue may have saved the expense of a lengthy trial, but Brown Machine either gambled it would win at trial or simply did not realize it perhaps could make use of the Act. In either case, the issue is not now properly before this court.

Brown Machine's remaining arguments require little discussion. The company contends that it did not request Pratt to do anything illegal. As noted, however, Pratt need only show that Brown Machine requested acts that would violate Michigan's public policy, not that he or the company violated any criminal statute. Moreover, there was sufficient evidence, viewed in a light most favorable to the plaintiff, from which the jury could conclude that Brown Machine did, indeed, require the plaintiff to drop his investigation into the obscene telephone calls as a condition for continued employment. *See Wiskotoni,* 716 F.2d at 383–84.

We also reject Brown Machine's contention that the district court improperly instructed the jury on the relative burdens of proof. *See Authier v. Ginsberg,* 757 F.2d 796, 798 (6th Cir.1985), *cert. denied,* 474 U.S. 888, 106 S.Ct. 208, 88 L.Ed.2d 177 (1985); Schlei & Grossman, *Employment Discrimination Law,* ch. 15, at 561 (1983). The jury could properly find on this record that Pratt's refusal to drop the investigation was the "determining factor" in his discharge; that is, that the company's legitimate reasons for firing the plaintiff were "not close to producing the adverse action." Schlei & Grossman, *supra,* at 561.

Accordingly, we AFFIRM the judgment in favor of David Pratt on his public policy claim.

## IV.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Brown Machine argues that Pratt has failed, as a matter of law, to establish intentional infliction of emotional distress. In *Polk v. Yellow Freight System, Inc.,* 801 F.2d 190, 195 (6th Cir.1986), we observed that the Michigan Supreme Court had not yet recognized intentional infliction of emotional distress as a tort in Michigan. The Michigan Supreme Court's most recent discussion of the tort was in *Roberts v. Auto–Owners Insurance Co.,* 422 Mich. 594, 374 N.W.2d 905 (1985). There, the Court said that it felt "constrained from reaching the issue as to whether this modern tort should be formally adopted in our jurisdiction" in light of its conclusion that the plaintiffs "failed even to meet the threshold requirement of proof to make out a prima facie claim of intentional infliction of emotional distress." *Id.* at 597, 374 N.W.2d at 906.

In *Polk,* this court took a similar approach. The plaintiff, a female clerical employee, asserted that a fellow employee (also a woman) subjected the female staff to "unwanted touching, sexual suggestions and homosexual advances, thus creating an intimidating and hostile work environment." *Polk,* 801 F.2d at 196. We ruled that it was unnecessary to decide whether the Michigan Supreme Court would adopt the emotional distress tort if faced with a substantiated claim because the evidence did not establish that "plaintiff suffered actual emotional distress of sufficient magnitude to allow her to recover from defendant on this claim." *Ibid.*[14]

Nevertheless, we are not without guidance from Michigan courts on this issue. Despite the Michigan Supreme Court's reluctance to engage "in a full blown discourse on the relative merits of the tort," *Roberts,* 422 Mich. at 597 n. 1, 374 N.W.2d at 906 n. 1, the Michigan Court of Appeals has adopted the tort as set forth in section 46 of the Restatement (Second) of Torts

---

**14.** We did not decide whether the behavior of plaintiff's fellow employee was so outrageous as to constitute intentional infliction of emotional distress.

(1965). *See, e.g., Margita v. Diamond Mortgage Corp.*, 159 Mich.App. 181, 406 N.W.2d 268 (1987); *Ledsinger v. Burmeister*, 114 Mich.App. 12, 318 N.W.2d 558 (1982). Absent controlling case law from the Michigan Supreme Court to the contrary, we will follow this jurisprudence. *Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1140 (6th Cir.1986) ("Where a state's highest court has not spoken on a precise issue, a federal court, sitting in a diversity case, may not disregard a decision of the state appellate court on point, 'unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'") (citations omitted).

Section 46 of the Restatement (Second) reads as follows:

> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

*Restatement (Second) of Torts § 46 (1965).* The Restatement defines this tort narrowly:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he had intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Id.* at § 46, comment d. A defendant is not liable for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Ibid.* Moreover, he is not liable "where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress." *Id.* at § 46, comment g.

A plaintiff must establish four elements to make out a prima facie case of intentional infliction of emotional distress: 1) extreme and outrageous conduct; 2) intent or recklessness; 3) causation; and 4) severe emotional distress. *Margita*, 159 Mich. App. at 187–88, 406 N.W.2d at 271.

In his complaint, and before the district court, Pratt claimed that he suffered severe emotional distress as a result of the January 10, 1984, meeting with Brown Machine's president, Jim Sharpe, concerning the terms of Pratt's reemployment. Brown Machine argues that its conduct can hardly be characterized as "so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized society." The company says, "[t]he interview, arranged at Pratt's request, was simply Pratt's attempt to negotiate a new contract of employment. At their very worst Sharpe's actions could only be characterized as 'misguided' or slightly 'heavy handed', but they do not 'remotely approach extreme and outrageous conduct.'" (citing *Coogan v. City of Wixom*, 820 F.2d 170 (6th Cir.1987)). We disagree.

In *Margita v. Diamond Mortgage Corp.*, 159 Mich.App. 181, 406 N.W.2d 268 (1987), and earlier in *Ledsinger v. Burmeister*, 114 Mich.App. 12, 318 N.W.2d 558 (1982), the Michigan Court of Appeals indicated that "context" was an important element in assessing emotional distress claims.

> The extreme and outrageous character of conduct may arise from the position of the actor or a relationship to the distressed party. For example, it may occur through an abuse of a relationship which puts the defendant in a position of actual or apparent authority over a plaintiff or gives a defendant power to affect a plaintiff's interest. Whether a defendant's acts were sufficiently outrageous depends upon the context in which the defendant committed them.

*Margita*, 159 Mich.App. at 189, 406 N.W.2d at 272. We must consider David Pratt's

claim within the context of the events surrounding the January 10, 1984, meeting, as well as his relationship at that time with President Sharpe.

■ Viewing the evidence in the light most favorable to the plaintiff, we reject the Brown Machine contention that reasonable minds could only conclude that Pratt failed to establish a case of extreme and outrageous conduct. *See Coogan v. Wixom,* 820 F.2d 170, 174 (6th Cir.1987). By the January 10 meeting, Brown Machine understood that David Pratt was in a vulnerable position. He was suffering emotionally, having seen his wife endure some 18 months of obscene and harassing phone calls. He was also in dire financial condition, which forced him to plead for his job back. With the promise of a new job dangling like a carrot before a horse, Jim Sharpe had the leverage to enforce certain conditions that would silence Pratt and, at the same time, ensure the reputation of Griffore and the company.

Sharpe knew full well that Griffore had threatened and harassed the Pratts with obscene telephone calls for some 18 months. He even conceded this to Pratt. Despite this knowledge, he conditioned reemployment on Pratt's agreement to apologize to Griffore, to work directly under him, and to attend church and pray with Griffore. Not only was this an experience that Pratt would have to endure every day on the job, he would have to remain silent or risk losing his job. In order to ensure his silence, Sharpe forced Pratt to rehearse repeatedly the words, "I don't want to talk about it; I can't talk about it." Without this exact response, Brown Machine would terminate Pratt. In short, Sharpe required Pratt to endure the humiliation of helping to enhance the reputation and standing of a person who jeopardized Pratt's employment, seriously undermined his family's happiness, terrorized his family, and threatened to rape his wife. The outrage was compounded by the fact that all this was done by an employer who spe-

cifically acknowledged that he knew where the truth lay.

We reject Brown Machine's contention that Sharpe was merely insisting upon the company's legal right to interview a prospective employee. Brown Machine had a legal right to interview Pratt, but it had no legal right to hinge his reemployment on his agreement to conceal wrongdoing, and to attend church and pray with an admitted maker of obscene telephone calls.

We conclude that the events of January 10, 1984, considered in the context of the surrounding circumstances, could be considered by the trier of fact as extreme and outrageous, within the meaning of the Restatement (Second) of Torts. Accordingly, the district court did not err in determining that this issue was one for the jury. *Margita,* 159 Mich.App. at 190, 406 N.W.2d at 272; *Ledsinger,* 114 Mich.App. at 20, 318 N.W.2d at 562.[15]

Next, Brown Machine contends that Pratt failed to establish severe emotional distress. The Restatement (Second) has this to say about severe emotional distress:

Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises. Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in

15. We do not find it relevant that Pratt requested the meeting. That he wanted the meeting to occur for a discussion of his reemployment did

not permit Brown Machine to inflict emotional harm.

itself important evidence that the distress has existed.

Restatement (Second) of Torts, § 46, comment j. Further, comment k states that while severe emotional distress is normally accompanied by shock, illness or other bodily harm, bodily harm is not necessary for the imposition of liability: "if the enormity of the outrage carries conviction that there has in fact been severe emotional distress, bodily harm is not required." *See also Dickerson v. Nichols*, 161 Mich.App. 103, 108, 409 N.W.2d 741, 743 (1987).

In *Roberts v. Auto–Owners Insurance Co.*, the Michigan Supreme Court refused to find that plaintiffs suffered severe emotional distress as a result of their insurer's failure to pay "replacement benefits" for an accident that their daughter suffered. The plaintiffs testified that they felt "disappointed," "mad," "upset" but did not have a breakdown or need the assistance of a hospital. The Supreme Court said:

> Although anger may be an indicia of emotional distress, the reaction testified to does not even approach the level of emotional distress contemplated by the Restatement drafters in requiring that "no reasonable man could be expected to endure it." Rather, plaintiffs' anger is more consistent with that which normally accompanies the breach of a contractual obligation. There was no evidence of grief, depression, disruption of life style, or of treatment for anxiety or depression.

*Id.* 422 Mich. at 610, 374 N.W.2d at 912.

We reached similar conclusions in *Polk v. Yellow Freight System, Inc.* As a result of her co-worker's homosexual advances, plaintiff would cry "quite a bit," and attend church more regularly. During her final altercation with the instigator, plaintiff was "crying" because she was "upset, angry and embarrassed." Plaintiff's husband testified that she "broke down and started crying" when she came home that day. We concluded that these "reactions are consistent with those of any employee faced with an unhappy or unpleasant work situation," but they did not amount to severe emotional distress as contemplated by the Restatement. *Id.* at 196–97.

In the instant case, the evidence is on a different footing. Dr. Michael Abramski, a clinical psychologist, testified that Pratt had suffered an "extremely traumatic stressor event." After the January 10 meeting, Abramski said that "Pratt was really at the edge," and "extremely overly emotional, where his judgment was suffering.…" The physician also opined that Pratt not only suffered "intense anger," but he became "extremely despondent" and depressed. This caused mood changes and lack of sleep.

Dr. Abramski believed that Pratt was caught in a tremendous conflict. He wanted his job back, but did not understand why he should be forced to comply with unreasonable conditions. According to Abramski, "When individuals consistently do what they think is right, when they haven't intentionally tried to hurt anybody, when they have done all the right things, and they get harmed for them, it's a real breeding ground for severe psychological problems." When Abramski was asked about the "breeding ground" for Pratt, he replied

> I think for him, he had done what he was supposed to do, both in terms of himself as an employee, and when something wrong was done to him, trying to get to the bottom of it, what he saw was the company telling him he was wrong, that he had to not be critical, that he should forget about his search, this obsession to get to the bottom of things, and that he should really just push it under the rug. So he saw himself as being punished for doing the right things.

Based on this testimony, and in light of the character of Sharpe's conduct, we conclude that there was sufficient evidence for a reasonable jury to conclude that Pratt suffered severe emotional distress, as contemplated by the Restatement (Second) of Torts. Pratt's reactions were not simply those of "any employee faced with an unhappy or unpleasant work situation," *Polk*, 801 F.2d at 196; they were more akin to the conditions that were noticeably absent in *Roberts:* depression, anxiety and disrup-

tion of life style. Moreover, the extreme and outrageous character of Brown Machine's conduct was in itself important evidence that the distress existed. The district court did not err in leaving this issue for the jury's determination. *Dickerson,* 161 Mich.App. at 108, 409 N.W.2d at 743.[16]

Finally, we find no merit to Brown Machine's contention that the evidence totally failed to show that the company intended to cause the emotional distress. (Brown Machine submits that this could only be shown under Michigan law by evidence of an "ongoing pattern of harassment or brutal and gruesome circumstances not remotely approached by the proofs of mental distress in this case.") The Restatement (Second) of Torts indicates that "intent or recklessness" is required. *See Roberts,* 422 Mich. at 602, 374 N.W.2d at 908. Sharpe's recklessness cannot seriously be questioned. He knew Griffore had confessed, and stated so, yet he demanded outrageous and gruesome conditions for reemployment. The issue was one for the jury to decide on this record. *See Dickerson,* 161 Mich.App. at 108, 409 N.W.2d at 743.

Accordingly, we AFFIRM the judgment in favor of David Pratt on his claim for intentional infliction of emotional distress.

## V. DAMAGES

Since we reversed the district court on the *Toussaint* claim but affirmed the judgment on the remaining claims, we must consider whether the jury's award of damages for wrongful termination of employment should be reduced. In the special verdict form, the jury found that David Pratt had been wrongfully terminated without just cause and in violation of Michigan public policy. The jury then awarded economic damages arising from the wrongful termination, and noneconomic damages solely for the termination in violation of Michigan public policy. It awarded $62,000 in economic damages for David Pratt's wrongful termination of employment and an additional $60,000 in noneconomic damages for violation of Michigan public policy.[17]

We conclude that our reversal on the *Toussaint* claim does not affect Pratt's recovery of the $62,000 in economic damages resulting from his wrongful termination. As the district court's jury instructions and the special verdict form make clear, the jury could award economic damages if it found that David Pratt was wrongfully terminated either in violation of *Toussaint* or of Michigan public policy. The jury's verdict, and the award of $62,-000, reflects its determination that Pratt was wrongfully terminated under both theories of recovery. Since we affirm the jury's conclusion that Pratt's discharge was "wrongful" under Michigan public policy, the economic loss flowing from the wrongful termination is still recoverable.

We also rule that Pratt may recover the $60,000 in noneconomic damages awarded by the jury on the Michigan public policy claim. To be sure, noneconomic or tort-based damages are normally not permitted in contract actions. *See, e.g., Valentine v. General American Credit, Inc.,* 420 Mich. 256, 362 N.W.2d 628 (1984). David Pratt's public policy claim sounds in tort, rather than contract. In *Wiskotoni v. Michigan National Bank–West,* 716 F.2d 378, 388 (6th Cir.1983) (and cases cited therein), we ruled that wrongful termination "in violation of public policy states an action in tort, rather than contract," and therefore "damages [were] not limited by contract principles." Without a more definitive statement from the Michigan Supreme Court on this issue, the split in the Michigan appellate decisions does not require that we abandon our holding in *Wiskotoni. Compare Goins v. Ford Motor Co.,* 131 Mich.App.

---

**16.** We find no error in the district court's refusal to grant a continuance to allow Brown Machine to depose Dr. Abramski concerning certain psychological testing. We do not believe the employer was prejudiced in any respect.

**17.** The jury also awarded $20,000 for intentional infliction of emotional distress; and $10,000 for Teri Pratt's loss of consortium claim in connection with her husband's emotional distress claim. Since we affirm the jury's verdict on the emotional distress claim, these awards are not subject to reduction.

185, 347 N.W.2d 184, 191 (1983) (wrongful termination in violation of public policy states an action in tort, rather than contract), *with Watassek v. Michigan Department of Mental Health,* 143 Mich.App. 556, 372 N.W.2d 617 (1985) (wrongful termination in violation of public policy states an action in contract, rather than tort).

Accordingly, we AFFIRM the jury award in the amount of $152,000.

MILBURN, Circuit Judge, concurring and dissenting.

I concur with parts III, IV, and V of the majority opinion. However, I respectfully dissent from part II for the reasons that follow.

Although I agree with most of the majority's reasoning on the issue of wrongful discharge, I am of the view that the employee handbook issued by Brown Machine Company set forth conflicting employment policies, and, therefore, the conflict was properly resolved by the jury. In addition to the at will provision contained in the final "tear-out page," which is set out in the majority opinion, the handbook also provided, at pages 41 and 42:

COMPANY RULES

In order to promote the common good and welfare of the Company and its employees, the Company has established rules of conduct generally accepted in industry. *The commission of any of the acts listed below will result in disciplinary action ranging from verbal or written warnings to suspension or to immediate discharge* depending upon the act and the circumstances.

ATTENDANCE

1. Excessive tardiness or absence.

2. Absence without notification for three (3) or more consecutive work days.

3. Leaving company premises during working hours without permission.

4. Failing to report absence within 1½ hours of starting time.

5. Failing to return from leave of absence as scheduled.

6. Improper use of accident leave or extended disability leave benefits.

CONDUCT

7. Punching another employee's time card, or allowing another to punch one's time card.

8. Making unauthorized solicitations or distributions during working time.

9. Failure to follow established work procedure.

10. Insubordination.

11. Restricting own production or interfering with production of other employees.

12. Loafing, loitering or sleeping on the job.

13. Conducting personal business on Company time.

14. Fighting or committing an assault.

15. Incurring excessive wage garnishments.

16. Using abusive or threatening language.

17. Gambling on Company premises.

18. Using or being under the influence of intoxicants or narcotics on Company premises.

19. Disorderly, offensive or immoral conduct.

20. Falsifying any Company records or employment application.

21. Stealing or commission of any criminal offense on Company property.

SAFETY AND HEALTH

22. Violating safety regulations.

23. Horseplay or use of machinery, equipment, tools, in a hazardous manner.

24. Possessing firearms, weapons, explosives, etc., on the premises.

25. Failing to make immediate report of an occupational injury.

26. Creating or contributing to any unsanitary condition.

MISUSE OF PROPERTY

27. Damage to or improper use of Company property either willfully or through gross negligence.

28. Intentional making of scrap or waste.

29. Unauthorized possession of Company property.

30. Disclosure of confidential Company information to outsiders without proper authorization.

31. Failure to properly park or operate personal automobiles on Company property.

32. Unauthorized use of bulletin boards.

33. Posting notices in unauthorized places.

VIOLATION OF COMPANY RULES

All employees will note that when it becomes necessary to apply the Company rules, the groups, I, II, and III are established to develop *a philosophy of progressive corrective discipline.*

Group "I" Rules

A violation of a group "I" Rule *will be handled* in a four step procedure.

1st Step—Verbal warning confirmed in writing.

2nd Step—Another violation of any group "I" Rules within a 30 working day period will be subject to a written warning.

3rd Step—Violation of any group "I" Rule within 60 working days from written warning will be subject to disciplinary lay-off.

4th Step—Another violation of any group "I" Rule within a 60 working day period following a disciplinary lay-off will be subject to discharge.

Company rules number 1, 3, 4, 9, 17, 23, 26, 31, 32, 33, are considered group "I" type rules.

The violation of a Group "II" Rule *will be handled* in a three step procedure.

Group "II" Rules

1st Step—Constitutes a written warning.

2nd Step—Disciplinary lay-off.

3rd Step—Discharge.

Company rules numbers 2, 5, 6, 8, 10, 11, 13, 15, 22, 24, 25, 30, are considered group "II" type rules.

The violation of a Group "III" Rule will be subject to immediate discharge, such as; Company rules number 7, 12, 14, 16, 18, 19, 20, 21, 27, 28, and 29. J.A. at 2358–59 (emphasis supplied). Thus, while the handbook does purport to inform Brown Machine employees that their employment could be terminated at will (the final "tear-out page"), the handbook also explicitly indicates that certain conduct will not result in termination, but in less severe discipline.

When an employer explicitly states in its employee handbook that employment is at will, it necessarily follows that employee concerns about job security will be aroused. However, if the employer, in an effort to hire and retain good employees and allay their fears concerning job security, additionally sets out rules regarding specific conduct and specific corresponding disciplinary procedures that *will* be applied, then the employer should be bound by them. In the present case, as Brown Machine concedes in its brief, the conduct of Pratt arguably fell within several of the listed types of conduct and would have been arguably subject to different disciplinary procedures. Therefore, Brown Machine should not be allowed to escape its specific and explicit representations concerning discipline by relying upon an at will employment provision contained in the same employee handbook. *See Damrow v. Thumb Cooperative Terminal, Inc.,* 126 Mich.App. 354, 361–64, 337 N.W.2d 338, 342 (1983) (Employers are not free to depart from existing policies stated in a policy manual simply on grounds that they were under no obligation to adopt them in the first place.).

In holding that the Company Rules section does not detract from the at will language in the subsequent tear-out page, the majority relies upon this court's decision in *Reid v. Sears, Roebuck & Co.,* 790 F.2d 453 (6th Cir.1986). However, *Reid* is distinguishable from the present case. In *Reid,* the employee handbook in question contained a provision that violation of enumerated company rules *"may* result in termination of your employment." *Id.* at 457 (emphasis supplied). We held that delineating conduct that may result in termination did not preclude at will discharge nor conflict with the at will discharge provision of

the employee handbook. On the other hand, the provision in question in this case does not delineate examples of conduct that *may* result in discharge, but provides enumerated types of conduct with specific corresponding levels of "progressive corrective discipline" which ranged "from verbal or written warnings to suspension or to immediate discharge depending upon the act and the circumstances that *will be* exercised." Clearly, employees of Brown Machine were led to believe and/or had a reasonable expectation that their employment was not at will, as Brown Machine explicitly informed them that certain conduct would result in discipline less severe than discharge.

More importantly, in a holding *subsequent* to this court's decision in *Reid*, the Michigan Court of Appeals has addressed this very question. In *Dalton v. Herbruck Egg Sales Corp.*, 164 Mich.App. 543, 417 N.W.2d 496 (1987), the Michigan Court of Appeals held that if an employee handbook *contains both an at will provision and provisions which provide for progressive discipline leading up to termination,* "the question whether an employment contract with a just cause termination policy has been formed is a question of fact to be resolved by the jury." *Dalton*, 417 N.W.2d at 498. Therefore, any holdings of this court in *Reid* on this issue of substantive state law that are in conflict with *Dalton* are no longer valid. *See Wieczorek v. Volkswagenwerk, AG*, 731 F.2d 309, 310 (6th Cir.1984) ("The law of Michigan is controlled by a decision of the Michigan Court of Appeals until the Michigan Supreme Court or another panel of the Michigan Court of Appeals rules otherwise."); *Simpson v. Jefferson Standard Life Ins. Co.*, 465 F.2d 1320, 1323 (6th Cir.1972) ("decisions of intermediate state courts must be followed by the federal court unless there is reason to believe they would not be followed by the state's highest court.").

Thus, the conflicting provisions of the employee handbook in question in this case justified the district court's denial of a di-

rected verdict. Moreover, "[a]s we have often stated, '[w]hen this court is reviewing a district judge's interpretation of state law, we give "considerable weight" to the interpretation of the judge.' " *Martin v. Joseph Harris Co.*, 767 F.2d 296 (6th Cir. 1985) (quoting *Bagwell v. Canal Ins. Co.*, 663 F.2d 710, 712 (6th Cir.1981)). *See also Insurance Co. of N. America v. Federated Mut. Ins. Co.*, 518 F.2d 101, 106 n. 3 (6th Cir.1975). In sum, the conflict raised a question of fact which was properly resolved by the jury. Accordingly, I would AFFIRM the district court on the issue of wrongful discharge (*Toussaint*) as well as the other issues raised in this appeal.