Terry ELSEY, Plaintiff–Appellant,

v.

**BURGER KING CORPORATION,**
Defendant–Appellee.

No. 89–2364.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 18, 1990.

Decided Oct. 23, 1990.

---

Dennis W. Cleary (argued), Farmington Hills, Mich., for plaintiff-appellant.

Richard L. Hurford, Steven H. Schwartz (argued), Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., for defendant-appellee.

Before KENNEDY and GUY, Circuit Judges; and PECK, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

In this diversity action governed by Michigan law, plaintiff Terry Elsey appeals from the entry of summary judgment in favor of defendant Burger King Corporation (Burger King) on the plaintiff's breach of employment contract claim. Because we agree with the district court that the plaintiff was an at-will employee unprotected by an implied contract of employment under *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980), we affirm.

## I.

Terry Elsey began his employment with Burger King on January 24, 1979, and remained with the company until his February 7, 1986, termination. Starting on June 1, 1984, Elsey worked as a field systems analyst servicing and repairing computerized cash registers in various restaurants owned and operated by Burger King. In his capacity as a field systems analyst, Elsey also furnished services to restaurants owned by Burger King franchisees.

Soon after obtaining the field systems analyst position, which provided Elsey with a salary paid by Burger King, Elsey started charging franchisees an independent fee for the services he provided. In the course of this independent business, Elsey used a Burger King car and enlisted the record-keeping services of Burger King employee Denise Wilcox. He also ordered parts through Burger King (and then reimbursed the company) in order to gain a pricing advantage.

In August of 1985, Elsey and his colleagues attended a personal computer seminar sponsored by Burger King in Miami, Florida. Following Elsey's return to Michigan, Nancy MacIver wrote a memo to Elsey's supervisor, Joe Dallacqua, detailing Elsey's disruptive behavior during the four-day seminar. According to MacIver's memo, Elsey played computer games during the workshop, "scared" a seminar instructor by explaining that he had modified a borrowed computer to erase all of the files on the computer's hard disk, and brought a former Burger King employee to the workshop. On September 23, 1985, Burger King supervisor Dallacqua and human resources manager Wendell Russell formally notified Elsey that he was suspended for two weeks without pay based on "inappropriate use of Corporation equipment" and "[p]oor personal conduct" during the seminar. Elsey resorted to a disciplinary grievance procedure,[1] however, which ultimately resulted in a management committee decision to reduce the two-week suspension to a written warning and to award Elsey back pay.

On January 31, 1986, approximately two months after Elsey's suspension was overturned, manager Russell met with Elsey and ordered him to stop running his independent business. Elsey requested a written directive to clarify the scope of Russell's order, and Russell placed Elsey on indefinite leave pending resolution of the matter. Russell subsequently scheduled a February 6, 1986, meeting with Elsey for

---

1. During Elsey's tenure with Burger King, company employees did not work under a collective bargaining agreement. However, Elsey learned

of an existing grievance procedure when he sought assistance from Burger King's corporate offices in Miami, Florida.

further discussions concerning Elsey's independent business.

At the meeting on February 6, 1986, manager Russell presented Elsey with two documents—a questionnaire on compliance with corporate policies and a memorandum regarding the same subject. At Russell's request, the plaintiff completed the questionnaire, thereby disclosing and briefly describing his employment with Burger King franchisees. Russell then presented Elsey with the memorandum, which set forth the company's ethical standards including provisions proscribing receipt of compensation from Burger King franchisees. Russell instructed the plaintiff to sign the memorandum promising compliance with company ethical standards, but Elsey refused to sign the document until Russell allowed him to show the memo to an attorney. As Elsey freely admitted, his reluctance to sign the document was attributable, at least in part, to the fact that he wanted to continue to provide services to franchisees in exchange for compensation. Russell told the plaintiff that his refusal to sign and abide by the memorandum would result in discharge, yet Elsey remained intransigent. Consequently, Burger King terminated Elsey.

After the plaintiff's discharge, Russell allowed Elsey to examine a book setting forth Burger King policy. During his examination of the book, Elsey discovered and copied a three-page document entitled Human Resources Policy Manual on Termination and Resignation. The first paragraph of the document contained the following statement concerning job security:

Job Security is an important benefit which a company can provide its employees, and the building of this security is a major concern of the Company. On the other hand, each individual must earn this security by his contribution, in whatever degree and manner his opportunities provide, to the success of the Company. In addition, all employees as a group must earn this security by service to our customers, for in the long run they are the only ones who can guarantee jobs. In order to provide all deserving employees with the greatest possible degree of job security, Burger King has adopted the following policies and procedures.

One of the policies and procedures set forth in the manual expressly dictated that Burger King employees served in an at-will capacity:

[E]mployees and employer have the right to terminate employment at any time for any circumstance, and for any reasons that are attributed by the employer or employee.

Following his inspection of the manual, Elsey left Russell's office and sought no further assistance from his former employer.

Elsey filed suit against Burger King in the Oakland County, Michigan, Circuit Court on June 10, 1987. His single-count complaint alleged a breach of employment contract claim predicated upon an implied "just cause" requirement arising from purported assurances of job security. The defendant promptly removed the action based on diversity of citizenship, and the plaintiff later amended his complaint to set forth additional state claims for intentional infliction of emotional distress and retaliatory discharge in violation of public policy. The defendant then moved for summary judgment on all three claims. The district court rendered an oral opinion granting summary judgment with respect to all three claims, and entered a written order on April 7, 1989, memorializing its determinations. The plaintiff subsequently filed a Federal Rule of Civil Procedure 59(e) motion to alter or amend the judgment, which the district court denied in a November 7, 1989, written order. This appeal followed.

The plaintiff's arguments on appeal focus exclusively on his claim for breach of an implied "just cause" employment contract. Specifically, the plaintiff contends that the record contains adequate policy manual language and sufficient evidence of oral assurances to support his assertion of a "just cause" requirement for discharge under *Toussaint*, 408 Mich. 579, 292 N.W.2d 880. Thus, he argues that the district court erred in granting summary judgment for the defendant. We review the district court's decision to grant sum-

mary judgment *de novo.* *See, e.g., Storer Communications, Inc. v. National Ass'n of Broadcast Employees and Technicians, AFL–CIO,* 854 F.2d 144, 146 (6th Cir.1988).

## II.

Michigan law provides that relations between employers and their employees are generally "terminable at the will of either party." *Lynas v. Maxwell Farms,* 279 Mich. 684, 687, 273 N.W. 315 (1937); *see also Valentine v. General American Credit, Inc.,* 420 Mich. 256, 258–59, 362 N.W.2d 628 (1984); *Wiskotoni v. Michigan Nat'l Bank–West,* 716 F.2d 378, 384 (6th Cir.1983). In *Toussaint,* however, the Michigan Supreme Court recognized the concept of an implied "just cause" limitation on discharge. Specifically, the *Toussaint* court held that "an employer's express agreement to terminate only for cause, or statements of company policy and procedure to that effect, can give rise to rights enforceable in contract." 408 Mich. at 610, 292 N.W.2d 880. *Toussaint* therefore indicated that a "just cause" limitation on discharge could be implied "either by express agreement, oral or written, or as a result of an employee's legitimate expectations grounded in an employer's policy statements." *Id.* at 598, 292 N.W.2d 880.

The oral promise and policy manual prongs of *Toussaint* were not formally compared and contrasted until 1989 when the Michigan Supreme Court rendered two opinions interpreting *Toussaint.* *See In re Certified Question (Bankey v. Storer Broadcasting Co.),* 432 Mich. 438, 443 N.W.2d 112 (1989); *Bullock v. Automobile Club of Michigan,* 432 Mich. 472, 444 N.W.2d 114 (1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1118, 107 L.Ed.2d 1024 (1990). The Michigan Supreme Court's decision in *Bullock* confirmed the reasoning of *Toussaint* that employers' oral promises give rise to enforceable contractual rights. *Bullock,* 432 Mich. at 482–83, 444 N.W.2d 114. In the *Certified Question* opinion, however, "the Michigan Supreme Court expressly eschewed a contractual approach to the policy manual prong of *Toussaint.*" *Shivers v. Saginaw Transit Sys.,* 719

F.Supp. 599, 601 (E.D.Mich.1989) (citing *Certified Question,* 432 Mich. at 454, 443 N.W.2d 112). The *Certified Question* court explained that:

Under the *Toussaint* analysis, an employer who chooses to establish desirable personnel policies, such as a discharge-for-cause employment policy, is not seeking to induce each individual employee to show up for work day after day, but rather is seeking to promote an environment conducive to collective productivity. The benefit to the employer of promoting such an environment, rather than the traditional contract-forming mechanisms of mutual assent or individual detrimental reliance, gives rise to a situation "instinct with an obligation."

*Certified Question,* 432 Mich. at 454, 443 N.W.2d 112. Accordingly, policy manual terms are "enforceable not as express promises, in quasi contract, or because of promissory estoppel, but because the [Michigan Supreme] Court under its common-law authority recognize[s] the enforceability of 'a situation "instinct with an obligation,"' an obligation distinct from and independent of contract analysis." *Bullock,* 432 Mich. at 480, 444 N.W.2d 114 (explaining *Certified Question*); *see also Shivers,* 719 F.Supp. at 601 (same). Elsey's reliance upon policy manual terms and oral promises to avoid the general rule of at-will employment mandates analysis of both *Toussaint* prongs.

### A. Policy Manual Terms

■ To characterize his employment with Burger King as "a situation 'instinct with an obligation,'" *see Certified Question,* 432 Mich. at 454, 443 N.W.2d 112, Elsey cites the policy manual provision stating that "[j]ob security is an important benefit which a company can provide its employees, and the building of this security is a major concern of the Company." This statement, however, is immediately followed by the qualifying comment that "each individual must earn this security by his contribution, in whatever degree and manner his opportunities provide, to the success of the Company." Thus, any suggestion of job security in the initial sen-

tence of the policy is clearly offset by the subsequent caveat that employees must earn whatever job security they may obtain. More importantly, the policy manual contains an explicit declaration of at-will employment: "employees and employer have the right to terminate employment at any time for any circumstance, and for any reasons that are attributed by the employer or employee." In light of the foregoing language, we find that this is not a case involving conflicting policy manual statements of at-will status and "just cause" limitations. Because the policy manual at issue unequivocally established that the plaintiff's employment was at-will, the plaintiff cannot avoid summary judgment by relying upon the holding of *Dalton v. Herbruck Egg Sales Corp.*, 164 Mich.App. 543, 547, 417 N.W.2d 496 (1987), that conflicting policy manual statements require jury consideration.[2] *See Vollrath v. Georgia–Pacific Corp.*, 899 F.2d 533, 535–36 (6th Cir.1990) (similarly distinguishing *Dalton*), *petition for cert. filed*, 59 U.S.L.W. 3168 (U.S. Aug. 27, 1990) (No. 90–369).

The plaintiff's policy manual claim is further undermined by his concession that he was unaware of the Burger King policy manual until after his discharge. The rationale for policy manual claims is that employers who promulgate policies favorable to their employees "secure[ ] an orderly, cooperative and loyal work force," *see Toussaint*, 408 Mich. at 613, 292 N.W.2d 880, and therefore should not be permitted to "reap the benefits of improved employee morale without shouldering the burden of abiding by the policy manual terms that engender the improved morale." *Shivers*, 719 F.Supp. at 602. Here, Elsey cannot argue that Burger King furnished him with a policy manual in order to enhance his productivity by providing him with a false sense of security. Accordingly, the district court was correct in holding that Burger King should not be liable for a claim based upon a policy manual that had no impact

whatsoever on the plaintiff's commitment to his job.

## B. Oral Promises

■ Although the Michigan Supreme Court's decision in *Bullock* conclusively established that an employer's oral assurances can place limitations upon the employer's right to terminate, *see Bullock*, 432 Mich. at 482, 444 N.W.2d 114, such limitations do not arise absent assurances creating "legitimate expectations" of continued employment. *See, e.g., Pratt v. Brown Mach. Co.*, 855 F.2d at 1232. Here, the plaintiff has conceded that no one ever told him that he could only be terminated for just cause. Nevertheless, the plaintiff argues that statements by manager Russell provided him with a legitimate expectation that pre-discharge grievance procedures were available. We disagree. Russell apparently mentioned a pre-discharge grievance procedure when consulting the plaintiff about dismissing an accounting clerk, but the evidence of record discloses that this procedure applied only to hourly employees, as opposed to salaried employees such as Elsey. Despite the district court's invitation of a Rule 59(e) motion to substantiate the plaintiff's argument that the procedure applied either in theory or in practice to salaried employees as well as hourly employees, the plaintiff produced only an affidavit setting forth his subjective belief that accounting clerks were classified as salaried employees. As we recently reiterated in *Pachla v. Saunders Sys., Inc.*, 899 F.2d 496 (6th Cir.1990), " 'a mere subjective expectancy on the part of an employee ... [does] not create a legitimate [*Toussaint*] claim.' " *Id.* at 501 (quoting *Boynton v. TRW, Inc.*, 858 F.2d 1178, 1185 (6th Cir.1988) (*en banc*)). Therefore, in the absence of evidence establishing a pre-discharge grievance procedure applicable to salaried employees, the district court properly reaffirmed the entry

**2.** Even if we agreed with the plaintiff's assertion that the policy manual in this case contained conflicting signals concerning at-will status, our rejection of the *Dalton* rule in *Pratt v. Brown*

*Machine Co.*, 855 F.2d 1225, 1234 n. 11 (6th Cir.1988), indicates that the at-will declaration in the policy manual entitles the defendant to summary judgment.

of summary judgment by denying Elsey's Rule 59(e) motion.

AFFIRMED.