953 F.2d 645
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Suzanne STEFFAN, Plaintiff-Appellant,
v.
HEALTH CARE & RETIREMENT CORPORATION OF AMERICA, INC., doing
business as Dearborn Heights Health Care Center,
Defendant-Appellee.
 No. 89-2423.
 United States Court of Appeals, Sixth Circuit.
 Jan. 22, 1992.
 
 Before DAVID A. NELSON and RYAN, Circuit Judges.*
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 This is a Michigan wrongful discharge action based on Toussaint v. Blue Cross & Blue Shield of Michigan, 308 Mich. 579, 292 N.W.2d 880 (1980). Filed initially in a state court, the action was removed to federal district court on diversity grounds. The district court ultimately entered summary judgment in favor of the employer, concluding that as a matter of law the plaintiff's employment was terminable at will.
 
 
 2
 After the plaintiff's appeal was argued, this court affirmed summary judgments for the same employer in actions brought by two of the plaintiff's fellow employees--women whose terms of employment were comparable to hers, and who were discharged during the same year she was. Fussell v. Health Care & Retirement Corporation of America, Inc., No. 90-1774, 1991 WL 66554, 1991 U.S.App.LEXIS 8970 (6th Cir. April 30, 1991) (per curiam); Jameson v. Health Care and Retirement Corporation of America, Inc., No. 90-1771, 1991 WL 66681, 1991 U.S.App.LEXIS 8831 (6th Cir. April 30, 1991) (per curiam). In keeping with these decisions, which are consistent with a subsequent decision of the Michigan Supreme Court, Rowe v. Montgomery Ward & Co., Inc., 437 Mich. 627, 473 N.W.2d 268 (1991), we shall affirm the judgment of the district court.
 
 
 3
 * The plaintiff in this case, Suzanne Steffan, was hired in 1981 as a food service supervisor at a nursing home then known as the Dearborn Heights Convalescent Center. It is indisputable that Ms. Steffan started out, at least, on an employment-at-will basis. In the first place, her employment application, which she signed on May 29, 1981, stated that "I UNDERSTAND AND AGREE THAT MY EMPLOYMENT IS FOR NO DEFINITE PERIOD AND MAY, REGARDLESS OF DATE OF PAYMENT OF MY WAGES AND SALARY, BE TERMINATED AT ANY TIME WITHOUT ANY PREVIOUS NOTICE." In the second place, Ms. Steffan points to no contemporaneous evidence rebutting Michigan's presumption that contracts of employment for an indefinite period "provide employment at will." Rowe, 473 N.W.2d at 271.
 
 
 4
 The nursing home was purchased by defendant Health Care & Retirement Corporation of America ("HCR") in the spring of 1986. Ms. Steffan continued in the same job under the new owner, and there is no suggestion in the record that the change in ownership resulted in any change in the at-will character of her employment. On the contrary, the record shows that the new employer convened a meeting of employees on May 6, 1986, at which time Ms. Steffan, like others in attendance at the meeting, signed a handbook "tear-out" sheet expressly acknowledging that "my employment is terminable at will...."
 
 
 5
 The handbook in question, which contained an introduction explaining that "[t]his booklet is designed to provide information about HCR's personnel policies and employee benefits," stated on its first page that "[t]his handbook should not be considered an employment contract." In a section entitled "EMPLOYMENT PRACTICES," the handbook contained this statement:
 
 
 6
 "High quality care requires consistent and satisfactory work from every staff member. Work that is considered by the supervisor or Administrator to be unsatisfactory will not be tolerated and may result in discipline. The method of discipline may be warnings, suspension, or discharge, depending upon the inadequacy of the work."
 
 
 7
 A "PERSONAL CONDUCT" section of the handbook listed 12 "Rules of Conduct" as to which it was said that violation "will result in suspension or discharge...." A number of additional "Rules of Conduct" were then set forth under the following introductory sentence: "The penalty for violating the rules listed below will be disciplinary action up to and including termination." The last item in the latter list read as follows: "Areas of misconduct noted elsewhere in this handbook, or which common sense would dictate are not appropriate behavior in the workplace, will be evaluated and handled according to their severity."
 
 
 8
 The final page of the handbook consisted of a perforated sheet captioned "ACKNOWLEDGEMENT OF RECEIPT." Below this caption was the following instruction: "After you have received and read this manual, please sign and return to your Supervisor the following acknowledgement of receipt." The acknowledgement consisted of a four-sentence paragraph which we quote in its entirety:
 
 
 9
 "I have received a copy of the Employee Handbook and have read it carefully. I understand all of its rules, policies, terms and conditions, and agree to abide by them. I understand and agree that any provision of this Handbook may be amended or revised at any time by the Company. I also understand and agree that my employment is terminable at will so that both the Company and I remain free to choose to end our work relationship, and further that nothing in this Handbook in any way creates an express or implied contract of employment between the Company and me."
 
 
 10
 This paragraph was followed by a date line and a signature line.
 
 
 11
 At her deposition, which was taken prior to the filing of the defendant's motion for summary judgment, Ms. Steffan indicated that copies of the handbook were given out at the May 6th meeting with no more discussion of the tear-out page than this: "Here is the handbook, sign the last page and give it to me." Ms. Steffan added, in her deposition, "That was it." When asked specifically if there was any discussion at the meeting about the printed paragraph on the tear-out page, she replied "I don't remember it."
 
 
 12
 In an affidavit signed after the filing of the summary judgment motion, however, Ms. Steffan was able to remember a discussion about the tear-out page that is described thus in the affidavit:
 
 
 13
 "Someone asked what that page was; the employees were told we didn't have to read that, because it was only to indicate that we had received the handbooks, and that it was necessary to turn the signatures in then, so HCR would know that the handbooks had been distributed."
 
 
 14
 Ms. Steffan acknowledged having signed and dated the tear-out page. When asked at her deposition if she read the paragraph immediately above her signature, she replied, "I don't think so." (Her subsequent affidavit is more definite: "I did not read it," the affidavit says.) Ms. Steffan testified that she read the remainder of the handbook "after a time."
 
 
 15
 In April of 1987 Ms. Steffan received a written "Employee Warning Notice." The warning notice dealt with tardiness in filling out purchase orders and with the need to prepare a nutritional assessment, or "diet card," for each patient within 72 hours after admission. The notice also spoke about "delinquent charting in regard to ongoing progress notes" and the "need to keep current with new admissions." Ms. Steffan discussed the warning notice at a conference with Irene Schneider, who was then the administrator of the facility. Ms. Steffan felt that the criticism was undeserved, and she testified that "[e]verything was fine" at a meeting held to review the situation 30 days later.
 
 
 16
 Another performance appraisal session was held with Ms. Steffan on July 25, 1988. This meeting was conducted by Marcia Jaszcz, who had become the acting administrator, and a regional manager named Frank Crawford. Ms. Steffan later testified that there was a discussion at this meeting about the need for her to bring her patient charts up to date, and she said she told Mr. Crawford that she would have to work overtime in order to catch up.
 
 
 17
 A few weeks later--on August 22, 1988, to be precise--acting administrator Jaszcz notified Ms. Steffan that her employment was being terminated. "[S]he told me that I did not know how to chart," Ms. Steffan testified, "and that the 72-hour patient initiation wasn't taking place...." Ms. Steffan takes vigorous exception to the HCR's criticism of her work, and she maintains that the company was at fault for not giving her enough time or enough help to get her paperwork done promptly.
 
 
 18
 Notwithstanding the signed acknowledgment that she understood and agreed that her employment with HCR was terminable at will, Ms. Steffan contends that she was the beneficiary of a contract of "permanent" employment that was "not subject to termination without good cause...." This contention is based, in part, on a meeting of department heads conducted at some point after December 31, 1987, the date on which Irene Schnieder was replaced as administrator by Ms. Jaszcz' immediate predecessor, Cathy Morelli. At this meeting, according to Ms. Steffan's affidavit, Ms. Morelli handed out a document entitled "HCR Rules of Conduct." The rules of conduct--to which reference was made in a revised employee handbook that Ms. Steffan says she never received[1]--listed almost 50 different infractions under the headings "minor," "serious," and "major." The document said that violations of a rule in the "minor" category "will result in progressive discipline as follows:
 
 
 19
 "First Violation--Verbal Warning
 
 Second Violation--Written Warning
 Third Violation--Final Written Warning
 
 20
 Fourth Violation--Discharge."
 
 
 21
 One of the infractions listed in this category was "Failure to accept and/or promptly carry out instructions or job responsibilities."
 
 
 22
 The record does not disclose whether Ms. Steffan ever read the "Rules of Conduct" document. The affidavit does, however, make this statement with regard to the meeting at which it was distributed:
 
 
 23
 "We were told that employees had to be disciplined in accordance with those rules, and that they required a three-step series of discipline before termination. We were specifically told that employees were not to be terminated unless that series had been exhausted, and that all instances justifying discipline, including incompetence, had to be documented in writing."
 
 
 24
 The affidavit says that acting administrator Marcia Jaszcz reiterated much the same message shortly before Ms. Steffan was discharged on August 22, 1988.
 
 
 25
 Ms. Steffan's affidavit indicates that at some point subsequent to the department head meeting, an HCR representative named Jim Millspaugh met with employees to "reassure us that we need not fear for our jobs, and that as long as we did our jobs, we wouldn't be fired." Mr. Millspaugh also said, according to the affidavit, that "[u]nless we were guilty of theft, vandalism, or patient abuse, we would not be fired if we didn't do anything wrong." In May or June of 1988, finally, the affidavit says that a man from the HCR Human Resource Department told the employees that "if we did our jobs and the facility passed its state inspection, we would not lose our jobs."
 
 
 26
 HCR has never contended that Ms. Steffan was dismissed in connection with a corporate reorganization or reduction in force. In interrogatory answers signed by Robert W. Possanza, Jr., who became the administrator of the Dearborn Heights facility after Ms. Steffan was discharged, HCR gave the following response to a question about its reasons for terminating the plaintiff's employment:
 
 
 27
 "The main reasons Plaintiff was fired are: 1) she repeatedly failed to prepare required documentation; 2) she repeatedly failed to prepare required documentation in a timely manner; 3) she repeatedly failed to follow instructions concerning documentation and failed to follow other instructions; and 4) she repeatedly failed to attend meetings that she had been asked to attend. There might be other reasons for her firing that are not mentioned in her personnel file and of which I am not currently aware."
 
 
 28
 If Ms. Steffan was not still an employee at will at the time of her discharge, there was obviously a jury question as to whether the alleged shortcomings in her performance justified her being discharged without additional warnings.
 
 II
 
 29
 Ms. Steffan filed suit against HCR in a Michigan state court, alleging that the discharge constituted a breach of a contract of permanent employment. The case was removed to the United States District Court for the Eastern District of Michigan on the basis of diversity of citizenship and the amount in controversy. After several months of discovery, HCR moved for summary judgment on the ground that Ms. Steffan was an at-will employee as a matter of law. Ms. Steffan opposed the motion, relying on her affidavit and on excerpts from the depositions of Ms. Jaszcz and Mr. Possanza.[2]
 
 
 30
 Following oral argument before District Judge Anna Diggs Taylor, the defendant's motion for summary judgment was granted in a ruling from the bench. Judge Taylor concluded that the existence of an at-will employment relationship was established when Ms. Steffan acknowledged in writing on May 6, 1986, that her employment was terminable at will; that Ms. Steffan was bound by this document whether she had read it or not; and that, in the court's words,
 
 
 31
 "There is no more the employer can do to disavow any expectation of job security in its employees. Certainly, the fact that various types of conduct are enumerated as unacceptable and the supervisors are admonished to attempt to discipline progressively as a matter of fairness does not prohibit the employer from exercising its rights under a contract terminable at will. This case is not one in which an employment contract can be enforced under Toussaint."
 
 
 32
 The bench ruling was subsequently incorporated in a written order, and Ms. Steffan perfected a timely appeal.
 
 III
 
 33
 Ms. Steffan challenges both the "conclusiveness" of the statement she signed on May 6, 1986, and the document's "very validity as a contractual statement." She argues that the caption was misleading, that she was not given a copy to keep with the rest of the handbook, and that "Defendant's representatives told the employees that they needn't bother reading the perforated page...."
 
 
 34
 We address the last contention first. The plaintiff's case would obviously be strengthened appreciably if she could show that the reason she signed the statement without reading it was that the defendant misrepresented its contents and told her not to bother reading it. It is well established, however, that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." Reid v. Sears, Roebuck & Co., 790 F.2d 453, 460 (6th Cir.1986), citing Biechele v. Cedar Point, Inc., 747 F.2d 209, 215 (6th Cir.1984). Ms. Steffan testified at her deposition that she was told to sign and return the last page, and "[t]hat was it." When asked specifically if there was any discussion about the printed paragraph, she replied "I don't remember it." It was only after the filing of the motion for summary judgment that she claimed to remember being told "we didn't have to read that, because it was only to indicate that we had received the handbooks...." As Reid and Biechele both pointed out, quoting from Perma Research & Development Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir.1969):
 
 
 35
 "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this could greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."
 
 
 36
 As to the caption on the tear-out sheet and the fact that the sheet was designed to be returned to the employer after being signed by the employee, the circumstances of this case are indistinguishable from those presented in the Fussell and Jameson cases cited at the outset of this opinion. Both Fussell and Jameson involved tear-out sheets designed to be returned to HCR, and the Fussell and Jameson tear-out sheets had exactly the same caption and text as Ms. Steffan's. We nonetheless held, in Fussell, that "the tear-out page operates to establish Fussell's employment as terminable at will...." 1991 WL 66554, at * 4, 1991 U.S.App.LEXIS 8970, at * 13.
 
 
 37
 HCR presents a stronger case here than it did in Fussell, because Ms. Steffan admits to having signed the tear-out sheet; the signed copy is in the record. There was no signed copy in Fussell, by contrast, and the Fussell plaintiff testified at her deposition that she did not remember whether the tear-out page was still in the handbook when she received it. The absence of a signed copy in that case did not prove fatal to HCR: Because "it remains undisputed that the employer considered the policy reflected in the tear-out page to be controlling, and copies of the handbook containing the tear-out page were distributed to employees," we said in Fussell, "Health Care 'took the action expressly approved in Toussaint and entered into contracts with its employees making the employment of each individual terminable at will.' " 1991 WL 66554, at * 5, 1991 U.S.App.LEXIS 8970, at * 17, quoting Ledl v. Quik Pik Food Stores, Inc., 133 Mich.App. 583, 588, 349 N.W.2d 529, 531 (1984), as quoted in Pratt v. Brown Machine Co., 855 F.2d 1225, 1233 (6th Cir.1988).[3]
 
 
 38
 There is certainly nothing ambiguous about express acknowledgements that "my employment is terminable at will," that "both the Company and I remain free to choose to end our work relationship," and that "nothing in this Handbook in any way creates an express or implied contract of employment between the Company and me." Ms. Steffan contends, nonetheless, that these statements are not "conclusive" because, among other things, the "progressive discipline" scheme described in the "Rules of Conduct" document distributed to department heads prior to the discharge was inconsistent with an employment-at-will arrangement. In support of this contention, Ms. Steffan points to the evidence that Cathy Morelli said that employees would not be terminated except in accordance with the Rules of Conduct; that Jim Millspaugh and another corporate representative told employees that they would not be fired if they did not do anything wrong; and that acting administrator Jascz reiterated that HCR's Handbook and Rules of Conduct did not permit termination without "good cause" as defined in the rules.
 
 
 39
 The problem Ms. Steffan faces in this connection is that precisely the same arguments were considered and rejected in Fussell; having rejected them there, we would be acting inconsistently if we accepted them here.
 
 
 40
 Citing Dell v. Montgomery Ward & Co., 811 F.2d 970, 974 (6th Cir.1987), where the employer had issued a "progressive discipline" guide but the parties were nonetheless held to be bound by a sign-off sheet stating that the employee could be discharged with or without cause, we stated in Fussell that the oral assurances and policy statements on which plaintiff Fussell relied had to be assessed in light of the "at will" language in the tear-out sheet. Like Ms. Steffan, the plaintiff in Fussell argued that the supervisors' assurances and the progressive discipline rules "could reasonably be considered a modification of the disclaimers so as to promote legitimate expectations of job security." 1991 WL 66554, at * 6, 1991 U.S.App.LEXIS 8970, at * 17. We rejected this argument, quoting Reid, 790 F.2d at 462, to the effect that Toussaint does not hold that there may be an implied just-cause-only contract "where an express contract makes the term of employment at will." Fussell, 1991 WL 66554, at * 6, 1991 U.S.App.LEXIS 8970, at * 18.
 
 
 41
 As to the oral assurances cited by plaintiff Fussell--essentially the same assurances cited by Ms. Steffan--Fussell flatly held that "[t]hese oral assurances fail to create a legitimate expectation of a just cause contract." Id. The opinion continues as follows:
 
 
 42
 "In Pratt, where the plaintiff relied on assurances that he would become a 'permanent' employee, had a 'very good' probability of continued employment, and would not be fired without just cause, we held that explicit at-will language in the employee handbook served 'to negate the legitimacy of any expectation [the employee] may have had based on [his manager's] representations.' 855 F.2d at 1234-35. Oral assurances of job security inconsistent with the express at-will language of a written policy establish 'at most a subjective expectation of dismissal only for cause.' Vollrath v. Georgia-Pacific Corp., 899 F.2d 533, 535 (6th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 345 (1990); see also Duncan [v. Rolm Mill-Speck Computers], 917 F.2d [261,] 264 [ (6th Cir.1990) ]. Although Health Care's representations may have given Fussell the subjective expectation that she would be discharged only for just cause, a 'subjective expectation does not create an enforceable contract right.' Sepanske v. Bendix Corp., 147 Mich.App. 819, 827, 384 N.W.2d 54, 58 (1985), appeal denied, 433 Mich. 914 (1989)." Fussell, 1991 WL 66554, at * 6, 1991 U.S.App.LEXIS 8970, at * 18-19.
 
 
 43
 As to the Rules of Conduct, Fussell points out that "we have consistently held that an employee handbook listing specific activities that may result in termination does not vitiate an express at-will employment contract and does not provide plaintiffs with a reasonable basis to conclude that employees will be terminated only for cause. Reid, 790 F.2d at 460; Dell, 811 F.2d at 974; Pratt, 855 F.2d at 1234-35." Fussell, 1991 WL 66554, at * 7, 1991 U.S.App.LEXIS 8970, at * 21.
 
 
 44
 Ms. Steffan relies on Dalton v. Herbruck Egg Sales Corp., 164 Mich.App. 543, 417 N.W.2d 496 (1987), for the proposition that "[w]here an employment manual expresses both a just cause termination policy and a termination at will policy, the question of whether the contract formed is terminable for cause or at will is a question of fact to be resolved by the jury." See also Butzer v. Camelot Hall Convalescent Centre, Inc., 183 Mich.App. 194, 454 N.W.2d 122 (1989), Schipani v. Ford Motor Co., 102 Mich.App. 606, 302 N.W.2d 307 (1981), and the unpublished opinion in Henry v. Montgomery Ward, No. 115402 (Mich.Ct.App. July 5, 1990). As we pointed out in Fussell, however, Dalton is distinguishable: "The tear-out page of the handbook received by plaintiff unequivocally established that 'employment is terminable at will,' and there is no conflicting language in the handbook...." Fussell, 1991 WL 66554, at * 7, 1991 U.S.App.LEXIS 8970, at * 22. This court, moreover, has repeatedly rejected Dalton as inconsistent with Toussaint. Vollrath v. Georgia-Pacific Corp., 899 F.2d 533, 536 (6th Cir.1990), cert. denied, 111 S.Ct. 345 (1991); Pratt, 855 F.2d at 1234 n. 11; see also Elsey v. Burger King Corp., 917 F.2d 256, 260 n. 2 (6th Cir.1990). Finally, Dalton and cases like it must now be read in light of Rowe v. Montgomery Ward & Co., Inc., 437 Mich. 27, 473 N.W.2d 268 (1991), where the Michigan Supreme Court seems clearly to have signaled an unwillingness to extend Toussaint to situations comparable to that presented in the case at bar.
 
 
 45
 The plaintiff in Rowe was hired by Montgomery Ward as a commissioned salesperson. Unlike Ms. Steffan, plaintiff Rowe was told during her pre-employment interview that she would have a job as long as her performance was satisfactory; like Ms. Steffan, however, and unlike the plaintiffs in Toussaint, Ms. Rowe did not "negotiate[ ] specifically regarding job security with the persons who interviewed and hired [her]." Rowe, 473 N.W.2d at 273, quoting Toussaint, 292 N.W.2d at 891. Upon being hired, Ms. Rowe signed a "Rules of Personal Conduct" sheet stating that offenses such as theft, destruction of property, falsification of records, and moral impropriety would result in immediate dismissal. But unlike the manual relied upon by the plaintiffs in Toussaint, the "Rules of Personal Conduct" in Rowe did not specifically provide that termination could only be for "just cause". 473 N.W.2d at 275. More than five years after the commencement of her employment, Ms. Rowe was given a handbook containing "disciplinary guidelines" that classified infractions according to severity and prescribed different types of discipline for transgression. In the back of the handbook was a "New Employee Sign-Off Sheet" on which the employee was asked to acknowledge that her employment was for no definite period and could be terminated at any time with or without cause. Ms. Rowe declined to sign the tear-out sheet because she did not feel it was right for an employee to be subject to dismissal without cause. Her employment was subsequently terminated under circumstances that did not, as a jury found, constitute just cause.
 
 
 46
 Notwithstanding the oral assurances that Ms. Rowe had received when she was hired, and notwithstanding the employer's rules of personal conduct and disciplinary guidelines, the Michigan Supreme Court held as a matter of law that Ms. Rowe was an at-will employee. The Court observed that "[n]othing in the rules [of personal conduct] suggested that the enumerated conduct was the only basis for dismissal, and the rules were consistent with a termination-at-will policy." 473 N.W.2d at 275. The Court went on to hold that "plaintiff cannot maintain an action for breach of contract on the basis of the disciplinary guidelines because the last handbook which plaintiff received clearly set forth an employment-at-will policy." Id.
 
 
 47
 Rowe relied heavily on our opinion in Dell v. Montgomery Ward & Co., Inc., 811 F.2d 970 (6th Cir.1987), where this court rejected a claim that Montgomery Ward's "Progressive Discipline Guide" created a contractual obligation not to dismiss employees except for just cause and after "due process." As noted above, the plaintiff in Dell had executed a sign-off sheet acknowledging that his employment could be terminated with or without cause--and the progressive discipline guide stated that the procedure set forth therein "does not form an employment contract."[4] In a passage quoted by the Michigan Supreme Court with obvious approval, 473 N.W.2d at 277, Dell declared that:
 
 
 48
 "The unequivocal language in the 'sign-off sheet' in this case, which stated that the employees could be discharged 'with or without cause and without any previous notice,' means what it says and is binding upon the parties. Similarly, the plain and simple statement in the [Progressive Discipline Reference Guide], that the due process procedures established there did 'not form an employment contract,' likewise means what it says." Dell, 811 F.2d at 974.
 
 
 49
 The logic of Rowe and Dell is fully consistent with that of Fussell and Jameson. The facts of the latter case are virtually indistinguishable from the facts presented here. Given the results reached in these cases and the others cited above, we conclude that the judgment of the district court in the case at bar ought to be, and it hereby is, AFFIRMED.
 
 
 
 *
 The Honorable George Clifton Edwards, Jr., Senior Circuit Judge, heard oral argument in this case but retired prior to issuance of the opinion
 
 
 [1]
 Ms. Steffan did not mention the "Rules of Conduct" in her deposition, and she emphatically denied having received any handbook after 1986:
 "Q When I was asking you about the handbook before, you testified that you did receive one in 1986?
 A Yes.
 Q Did you later get another handbook?
 A No.
 Q You didn't receive a revised version or an updated version of the handbook?
 A No.
 Q Were you aware that one was distributed?
 A No.
 * * *
 Q As far as you know, though, there was not a revised version that came out after May of 1986 but before you left HCR?
 A I only received that one."
 A copy of the "HCR Rules of Conduct" was attached to Ms. Steffan's affidavit, along with a copy of an HCR handbook employing the same graphics as the rules document. Under the heading "Rules of Conduct," this version of the handbook said that "[y]our Supervisor will give you HCR's general rules as well as any specific facility rules."
 The revised handbook and rules of conduct were evidently not designed to create a contractual right of continued employment, for the handbook had a tear-out page containing the following language immediately above a line for the employee's signature:
 "I understand and acknowledge that nothing in the Employee Handbook or Rules of Conduct creates a contract of employment, either expressed or implied, between the facility and myself."
 
 
 [2]
 Ms. Jaszcz testified that when she was hired as director of nursing at Dearborn Heights, she found in her desk drawer an HCR handbook containing a progressive discipline policy "which would lead me to presume that people would not be terminated for no cause." She said she did not think that HCR would be so "foolish" as to state expressly that HCR employers would only be fired for good reason, however
 Ms. Jaszcz testified that Frank Crawford told her to fire Ms. Steffan, and that Mr. Crawford was "under the gun" because Dearborn Heights had "a very bad quality assurance [report]" from HCR. Ms. Jaszcz's own view was that Ms. Steffan's paperwork problems resulted from the fact that she had a difficult load to carry, which led to her complaining about not having enough time to do the paperwork. Ms. Jaszcz did not think there was good cause for the termination.
 Mr. Possanza, who did not come to the Dearborn Heights facility until after the discharge, testified that it was his understanding that HCR employers had a right to expect that their jobs would continue in the absence of good cause for termination. This understanding appears to have been based on the following passage from the handbook that Ms. Steffan never received:
 "Our fundamental goal is to consistently provide quality care to our residents. To do that it is necessary to have rules that govern our conduct at work. The purpose of these rules is not to restrict the rights of anyone but to define and protect the rights of everyone."
 Only two pages of Mr. Possanza's deposition have been included in the record, and we do not know if he was aware of either the tear-out sheet in the revised handbook or the tear-out sheet that Ms. Steffan actually signed.
 
 
 [3]
 In Jameson, the companion case to Fussell, the plaintiff did not contest the fact that she had signed a tear-out sheet acknowledging that her employment was terminable at will. We noted that this distinction from Fussell "renders Jameson's claim even weaker." Jameson, 1991 WL 66681, at * 1, 1991 U.S.App.LEXIS 8831, at * 1, n. 1. Plaintiff Steffan's claim is weaker than plaintiff Fussell's was for precisely the same reason
 
 
 [4]
 In the case at bar HCR's statement that its "Rules of Conduct" did not create an express or implied contract was contained in a handbook that Ms. Steffan denied having received, but a comparable statement was contained on the very first page of the handbook that she acknowledged having received and read. From the company's standpoint, both handbooks clearly reflected a long-standing policy which the company had no intention of changing. The presumption of employment-at-will may be overcome by proof that "both parties intended to be bound" by a provision forbidding discharge in the absence of just cause, Rowe, 473 N.W.2d at 271 (emphasis supplied), but in the instant case, as in Rowe, "no objective evidence exists that [the minds of both parties] met on the subject of continued employment." Id. at 274