966 F.2d 1451
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Dwight C. BOWDISH and Rebecca Bowdish, Plaintiffs-Appellants,
v.
CONTINENTAL ACCESSORIES, INC., and Eugene A. Lehman,
Defendants-Appellees.
 No. 91-1548.
 United States Court of Appeals, Sixth Circuit.
 June 12, 1992.
 
 Before RYAN, BOGGS and BATCHELDER, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 Plaintiffs, Dwight C. Bowdish and Rebecca Bowdish, appeal the district court's grant of summary judgment in favor of the defendants, Continental Accessories and Eugene Lehman, on the plaintiffs' claims of religious discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and Michigan's Elliott-Larsen Civil Rights Act, M.C.L.A. § 37.2201 et seq., and breach of express and implied contract.
 
 
 2
 Plaintiffs contend that they raised genuine issues of material fact on each of their claims and that the district court therefore erred in granting summary judgment for the defendants. We conclude that the plaintiffs have failed to raise genuine issues of material fact on their assorted claims and we therefore affirm the district court's judgment for the defendants.
 
 I.
 
 3
 Dwight Bowdish was employed by the defendant, Continental Accessories, at its offices in Sturgis, Michigan from 1983 until November of 1987. At that time, in an effort to trim its staff and cut costs, Continental discharged Bowdish from his position as director of purchasing and marketing. Bowdish did not challenge this discharge.
 
 
 4
 Several months later, Continental expanded its operations in Florida. The expansion resulted in a new job opening similar to Bowdish's former position. Defendant Eugene Lehman, the Chairman of the Board of Continental, approached Bowdish to offer him the new position at Continental's Florida division.
 
 
 5
 Lehman and Bowdish negotiated over the terms of Bowdish's return to Continental. All of these negotiations took place in Michigan. The parties dispute several aspects of these negotiations. Bowdish alleges, for example, that Lehman told him that "[w]e will give you a year contract and we will renew it in the second year for more money." Bowdish also claims that Lehman agreed that Bowdish would report directly to Lehman and would retain the seniority and benefits, including three weeks of vacation per year, that he had accrued over his previous five years of employment for Continental. Defendant Lehman denies making these statements. Although Bowdish claims that Lehman told him that Continental would prepare a written contract, the parties never executed such a contract.
 
 
 6
 After reaching some agreement on the terms of his employment, Bowdish moved his family to Florida and began working at Continental's Florida division. At the time Bowdish resumed working, Continental had a handbook for salaried employees, which set forth various company policies and rules of conduct. In addition to listing certain types of conduct that would result in immediate discharge, the handbook provided:
 
 
 7
 Even though the above covers specific rules of conduct, we reserve the right at all times to terminate employees when work performed is not satisfactory to Continental Accessories. Further, we have the absolute right to terminate employees for any reason whenever we wish and it is not necessary to establish just cause.
 
 
 8
 The handbook also contained the following disclaimer on its front cover:
 
 
 9
 This handbook has been prepared expressly for the purpose of acquainting you with Continental Accessories policies and procedures for salaried employees. The provisions in this handbook are not a contract or guarantee of employment and Continental Accessories has the absolute right to change these provisions at anytime without notice.
 
 
 10
 The parties agree that from the time Bowdish arrived at Continental's Florida division, he was at odds with the general manager of that division, Jerry Waltz. On one occasion, the tension between the two erupted into a shouting match in front of other employees. Following this argument, Waltz issued Bowdish a written warning. Bowdish complained to Lehman about the incident, but Lehman merely urged Bowdish to "try to get along" with Waltz.
 
 
 11
 The parties also agree that the conflict between Waltz and Bowdish centered around their different views about the chain of command in the Florida division. Waltz conducted himself as if he were Bowdish's supervisor, while Bowdish believed that he reported directly to Lehman in Michigan.
 
 
 12
 The last of the disputes between Bowdish and Waltz occurred in December of 1988. When Bowdish announced that he was planning to take a three-week vacation during the Christmas holiday season, Waltz objected because it would cause Bowdish to miss the division's year-end inventory. Bowdish disregarded Waltz's objection, took the vacation, and missed the year-end inventory. On January 5, 1989, Waltz telephoned Bowdish and told him that if he did not return to work immediately, he might lose his job. Bowdish responded that he would not return because he had one more week remaining in his vacation, as approved by Lehman.
 
 
 13
 Upon returning home from his vacation, Bowdish discovered a letter from Waltz terminating his employment with Continental effective January 5, 1989, on grounds of insubordination. Bowdish phoned Lehman about his discharge, and Lehman informed him that he could return to work if he would make amends with Waltz. Bowdish refused.
 
 
 14
 Bowdish, who is a Methodist, was replaced in the Florida division by James M. Reynolds, a Jehovah's Witness. Eugene Lehman and several other top officials at Continental are also Jehovah's Witnesses, including John Lehman, the company president, Relmond Chamberlain, the financial administrator, and Jerry Waltz. Bowdish is one of several former Continental officers and employees who were not Jehovah's Witnesses and who, after leaving the company's employ, were replaced by members of that religion.
 
 
 15
 Bowdish proceeded to bring this suit, alleging religious discrimination, negligence, and breach of express and implied contract. The defendants moved for summary judgment, and the court granted their motion. Plaintiffs' timely appeal followed.
 
 II.
 
 16
 We review a grant of summary judgment de novo. EEOC v. University of Detroit, 904 F.2d 331, 334 (6th Cir.1990). We therefore apply the same standard as applied by the district court. Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."
 
 III.
 
 17
 Bowdish claims first that the defendants discharged him because of his religion in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e et seq., and Michigan's Elliott-Larsen Civil Rights Act, M.C.L.A. § 37.2201. The parties do not dispute that Michigan law applies to Bowdish's state law claims. In analyzing claims under the Elliott-Larsen Civil Rights Act, Michigan courts apply the same legal standards as the federal courts apply in Title VII cases. See Pomranky v. Zack Co., 159 Mich.App. 338, 343 (1987). We can therefore evaluate Bowdish's claims under both statutes, using the same legal standards.
 
 
 18
 Both Title VII and the Elliott-Larsen Civil Rights Act prohibit the discharge of employees on the basis of religion. 42 U.S.C. § 2000e-2(a)(1); M.C.L.A. § 37.2202(1)(a). Courts have recognized two different types of claims under these statutes: "disparate impact" claims and "disparate treatment" claims. Disparate impact claims involve facially neutral employment practices that have disproportionate impact on protected classes of individuals. Disparate treatment claims, in contrast, involve intentionally discriminatory employment practices. Bowdish advances a disparate treatment claim, alleging that defendants intentionally discharged him because of his religious beliefs.
 
 
 19
 Federal courts analyze Title VII disparate treatment claims under a three-part analysis. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981). Under the first step, the plaintiff must establish a prima facie case of discrimination. Id. at 253. To do so, a plaintiff must show that: 1) he belongs to a class protected by Title VII; 2) he performed his job satisfactorily; 3) he was discharged; and 4) after his discharge, the defendant filled the plaintiff's position. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Beaven v. Kentucky, 783 F.2d 672, 676 (6th Cir.1986).
 
 
 20
 If the plaintiff succeeds in making a prima facie case, the burden of production shifts to the defendant, in the second step of the analysis, to articulate some legitimate nondiscriminatory reason for its action. Burdine, 450 U.S. at 254. If the defendant demonstrates such a reason, the burden returns to the plaintiff, in the third step, to prove intentional discrimination by a preponderance of the evidence. Id. at 256.
 
 
 21
 Where a plaintiff lacks direct evidence of intentional discrimination, he may satisfy his burden in the last step of the analysis by showing that the defendant's articulated reason for its action is "merely a 'pretext,' intended to disguise the true reasons or motives for the treatment accorded the plaintiff." Hale v. Cuyahoga County Welfare Dep't, 891 F.2d 604, 606 (6th Cir.1989) (citation omitted). A plaintiff may demonstrate that the defendant's reason is a pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256.
 
 
 22
 The district court held that although Bowdish had established a prima facie case of discrimination, the defendants articulated a legitimate nondiscriminatory reason for his discharge, thus shifting the burden back to Bowdish to prove intentional discrimination. The district court granted summary judgment to the defendants because Bowdish failed to raise a genuine issue of fact that his discharge was the result of intentional religious discrimination.
 
 
 23
 On appeal, Bowdish contends that he raised a genuine issue of fact that the defendants discharged him because of his religion. As a preliminary matter, he argues that the district court erroneously relied upon the determination of an appeals referee of the Unemployment Compensation Division of the Florida Department of Labor as precluding his claim of religious discrimination. This argument is without merit. The district court did not give that determination any preclusive effect. The real issue is whether Bowdish produced sufficient evidence to raise a genuine issue of fact that the defendants discharged him on the basis of his religion. We conclude that the district court correctly held that he did not.
 
 
 24
 The core of Bowdish's evidence of discrimination consists of the following facts: he is not a Jehovah's Witness; most of the officers and managers at Continental, including the two who decided to discharge him, are Jehovah's Witnesses; and the man who replaced him is a Jehovah's Witness. Bowdish also introduced anecdotal evidence that several other former employees and directors of Continental, who were not Jehovah's Witnesses, were replaced by Jehovah's Witnesses.
 
 
 25
 As noted, the district court concluded that this evidence was sufficient to establish a prima facie case of discrimination. The district court further held that the defendants satisfied their burden of articulating a legitimate reason for the discharge of Bowdish by demonstrating the persistent conflict between Bowdish and Jerry Waltz, the general manager of the Florida division. Bowdish does not dispute that he frequently quarreled with Waltz over the line of authority in the Florida office. Nor does he dispute that he shouted at Waltz in front of other employees and refused to attend the year-end inventory. These undisputed facts establish, at the very least, a serious lack of cooperation on the part of Bowdish and at the most they demonstrate insubordination. Bowdish's conduct in this regard therefore constituted a legitimate basis for his discharge.
 
 
 26
 By articulating a legitimate reason for Bowdish's discharge, the defendants forced Bowdish to prove intentional religious discrimination. As noted above, he can do this "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256. Bowdish attempted both approaches and failed in each attempt.
 
 
 27
 Bowdish argues first that the defendants' proffered explanation of insubordination is unworthy of credence. In this regard, he maintains that he has raised a genuine issue of fact concerning whether he was Waltz's subordinate. He reasons that this fact issue is material to the credibility of the defendants' explanation of insubordination because he could not have been "insubordinate" if Waltz was not in fact his superior.
 
 
 28
 This argument misses the point. Summary judgment is proper where the nonmoving party fails to raise a genuine issue of material fact. Fed.R.Civ.P. 56(c). Even granting that the issue of whether Waltz was Bowdish's superior is genuinely disputed, it is not material to the legal question at hand. Bowdish admits that Lehman was his superior. He further admits that Lehman asked him to cooperate with Waltz on more than one occasion. Finally, Bowdish does not dispute that he failed to cooperate with Waltz. Given these facts, a rational jury could only conclude that the defendants' articulated nondiscriminatory reason for discharging Bowdish was credible.
 
 
 29
 Bowdish also attempts to demonstrate directly that discriminatory reasons were the more likely motivation for his discharge. His only evidence in this regard, however, is the anecdotal evidence described above--specifically, that several former Continental employees, including himself, who were not Jehovah's Witnesses, were replaced by Jehovah's Witnesses. He does not indicate a single instance where his religious beliefs resulted in discriminatory treatment toward him. He cannot even identify an instance where his religious beliefs were discussed or recognized by his employers.
 
 
 30
 Bowdish's anecdotal evidence, standing alone, is not sufficient to support his claim of individual intentional discrimination. As a preliminary matter, this anecdotal evidence simply does not amount to a valid statistical showing of intentional discrimination of the kind that is often used in class action suits to demonstrate disparate treatment of a protected class. See Wooldridge v. Marlene Indus. Corp., 875 F.2d 540, 545-46 (6th Cir.1989). But even if it did, such evidence, standing alone, still would not be sufficient to establish a case of individual disparate treatment. An individual plaintiff in an employment discrimination case must present some evidence that demonstrates that his or her individual discharge was the result of discrimination. See Gilty v. Village of Oak Park, 919 F.2d 1247, 1253 n. 8 (7th Cir.1990). Bowdish could have at least raised an issue in this regard, if he had presented some evidence that he was treated differently than similarly situated Jehovah's Witnesses. See Mcdonnell Douglas, 411 U.S. at 804. Bowdish presented no evidence of such differential treatment, however.
 
 
 31
 Bowdish also contends that his statements and the statements of other Continental employees that Continental engaged in religious discrimination are sufficient to raise a genuine issue of fact that he was discharged because of his religious beliefs. The subjective beliefs of Bowdish and other employees that Continental's employment decisions were based on religious grounds, however, are not sufficient to raise a genuine issue of intentional discrimination. See O'Shea v. Detroit News, 887 F.2d 683, 689 (6th Cir.1989).
 
 
 32
 In short, Bowdish failed to present sufficient evidence to withstand the defendants' motion for summary judgment. A rational jury could not have found intentional religious discrimination on the basis of the evidence presented. The district court therefore properly granted summary judgment to the defendants.
 
 
 33
 Bowdish raises one final argument. He notes that under Burdine, the plaintiff in an employment discrimination case must be given "the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision." Burdine, 450 U.S. at 256. Bowdish claims that he was not given an adequate opportunity for discovery. His complaint in this regard lacks merit. The parties in this case were given almost a full year to complete discovery, and the district court did not entertain the defendants' motion for summary judgment until the discovery deadline had passed. Bowdish fails to explain adequately why he was unable to obtain the evidence he needed during this time. He was given more than adequate opportunity to uncover evidence to support his claim of discrimination. His failure to do so in the time allotted suggests only that his claims lacked merit.
 
 IV.
 
 34
 Bowdish also contends that the defendants breached implied and express employment contracts when they discharged him. In this regard, he claims that oral statements made by Lehman and policy statements found in Continental's handbook for salaried employees resulted in the formation of an employment contract under which Bowdish could be dismissed only for just cause.
 
 
 35
 In Michigan, an employment contract is presumed to be terminable at will by either party in the absence of express contractual rights to the contrary. Rowe v. Montgomery Ward, 437 Mich. 627, 636 (1991); Valentine v. General Am. Credit, Inc., 420 Mich. 256, 258-59 (1984). The parties to an employment contract may alter this result either by express agreement or by an implied contract arising out of "legitimate expectations" based on statements or policies of the employer. Toussaint v. Blue Cross & Blue Shield of Michigan, 408 Mich. 579, 598 (1980).
 
 
 36
 Although the parties did not execute a written contract in this case, Bowdish maintains that there is sufficient evidence to create a genuine issue of fact regarding whether he had an express or implied contract with Continental that he would be discharged only for cause. He makes two arguments in this regard. First, he contends that during his negotiations with Eugene Lehman, Lehman promised him that he would have a job for at least two years. Second, he argues that certain statements contained in the salaried employees handbook gave rise to an implied contract that he would be discharged only for cause. We are not persuaded by either argument.
 
 
 37
 Bowdish claims first that a variety of statements made by Lehman during their negotiations created an express contract that Bowdish would be discharged only for cause. Significantly, Bowdish does not contend that Lehman specifically told him that he would be discharged only for cause. Bowdish merely suggests that the sum of their negotiations gave him the expectation that he would be discharged only for cause. He asserts, for example, that Lehman told him that "[w]e will give you a year contract and we will renew it in the second year for more money." This and the other alleged statements of Lehman, however, establish at most a subjective expectation on the part of Bowdish that he would be employed for at least two years, and subjective expectations derived from oral statements do not create enforceable contract rights, especially where, as here, the employee handbook contains express language that employment is at will. See, e.g., Duncan v. Rolm Mil-Spec Computers, 917 F.2d 261, 264 (6th Cir.1990); Vollrath v. Georgia Pac. Corp., 899 F.2d 533, 535 (6th Cir.), cert. denied, 111 S.Ct. 345 (1990); Dell v. Montgomery Ward & Co., 811 F.2d 970, 974 (6th Cir.1987). Lehman's alleged statements, even if true, did not create an express or implied contract that Bowdish would be discharged only for cause.
 
 
 38
 Bowdish's second argument is that certain clauses in the employees' handbook created an implied contract that employees would be discharged only for cause. In this regard, he points to statements in the handbook that refer to the fair treatment of employees and list specific grounds for discharge. Although the handbook included statements such as these, it also contained an express statement of the company's retention of the right to terminate employees for any reason: "we have the absolute right to terminate employees for any reason whenever we wish and it is not necessary to establish just cause." Where an employee handbook declares clearly that employees may be terminated at will, general statements concerning the fair treatment of employees do not give rise to an implied contract that employees will be discharged only for cause. See Elsey v. Burger King Corp., 917 F.2d 256, 260 (6th Cir.1990). The defendants' handbook in this case therefore did not create an implied contract that employees would be discharged only for cause.
 
 
 39
 For these reasons, Bowdish failed to raise a genuine issue of fact that he had an implied or express contract that altered his at-will status, and the district court therefore properly granted the defendants' motion for summary judgment on Bowdish's claim for breach of contract.
 
 V.
 
 40
 Bowdish's remaining claims are without merit. We therefore AFFIRM the judgment of the district court in all respects.